(221 P.3d 609)
No. 101,566

DEAN D. WELSCH, *Appellant*, v. TRIVESTCO ENERGY COMPANY, *et al.*, *Appellees*.

 Opinion
filed December 18, 2009. 

*Michael K. Johnston*, of Johnston & Eisenhauer, of Pratt, and *Larry E. Keenan*, of Keenan Law Firm, P.A., of Great Bend, for appellant.

*Michael P. Womack*, of Riggs, Abney, Neal, Turpen, Orbison & Lewis, P.C., of Tulsa, Oklahoma, and *Gordon B. Stull*, of Stull Law Office, P.A., of Pratt, for appellees.

*Gregory J. Stucky*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, and *David G. Seely*, of the same firm, for *amici curiae* The Southwest Kansas Royalty Owners Association and The Eastern Kansas Royalty Owners Association.

Before GREENE, P.J., MALONE, J., and KNUDSON, S.J.

GREENE, J.: Dean D. Welsch, successor in interest to the lessors in an oil and gas lease, appeals the district court's refusal to grant summary judgment cancelling the lease, as well as the court's award of summary judgment to Trivestco Energy Company, the successor in interest to the lessee in that lease, thus preserving the lease on the basis that the shut-in royalty provisions of the lease created a covenant with entitlement to money damages rather than a condition with entitlement to lease termination. As alternate bases for its decision, the district court relied on a construction and application of the force majeure clause in the lease and the doctrine of temporary cessation of production. Welsch argues that the failure of Trivestco to pay shut-in gas royalty payments caused the lease to expire by its own terms and that neither the force majeure clause nor the doctrine of temporary cessation of production apply to save the lease. We agree with Welsch, reverse the district court, and remand with directions to cancel the lease in favor of lessor Welsch.

### *Factual and Procedural Background*

The subject of this oil and gas lease cancellation action is a lease covering the northeast quarter and the north 80 acres of the east half of the west half of section 6, township 26 south, range 17 west, in Edwards County. The lease was entered into on May 23, 1975, and contained the following material provisions:

"2. Subject to the provisions herein contained, this lease shall remain in force for a term of three (3) years from this date (called the 'primary term') and as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them, is produced from said land or land with which said land is pooled.

"3. The royalties to be paid by lessee are: (a) on oil, and other liquid hydrocarbons saved at the well, one-eighth of that produced and saved from said land . . . (b) on gas, including casinghead gas and all gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the mouth of the well of one-eighth of the gas so sold or used . . . and (c) at any time either before or after the expiration of the primary term of this lease, if there is a gas well or wells on the above land . . . and such well or wells are shut in before or after production therefrom, lessee or any assignee hereunder may pay or tender annually at the end of each yearly period during which such gas well or gas wells are shut in, as substitute gas royalty, a sum equal to the amount of delay rentals provided for in this lease for the acreage then held under this lease by the party making such payments or tenders, and if such payments or tenders are made it shall be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities. . . .

. . . .

"6. If, . . . after discovery of oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, the production thereof should cease from any cause, this lease shall not terminate if lessee commences reworking or additional drilling operations within sixty (60) days thereafter. . . .

. . . .

"9. Lessee shall not be liable for delays or defaults in its performance of any agreement or covenant hereunder due to force majeure. The term 'force majeure' as employed herein shall mean: any act of God . . . ; exhaustion or unavailability or delays in delivery of any product, labor, service, or material."

By declaration of unitization dated June 26, 1978, and pursuant to an express provision in the lease, the lease acreage was unitized with adjoining leases to create a unit of approximately 682.4 acres. The only producing well on the unitized acreage was the gas well at issue herein.

In late August 2004, Trivestco shut in the gas well because the gas purchaser for this well ceased making payments for produced gas. The well remained shut in until late March 2007. In the interim, bankruptcy proceedings ensued involving the gas purchaser and related entities. At no time during this 2 and ½-year period did Trivestco pay or tender shut-in royalties to Welsch, nor did it

attempt to recommence production or to commence additional drilling activities at any time thereafter.

After Welsch made demand for release of the lease and negotiations between the parties failed, Welsch brought this action to declare the lease terminated. After discovery was concluded, both parties filed opposing summary judgment motions. The district court denied Welsch's motion but sustained Trivestco's motion, thus resulting in the preservation of the lease.

The district court justified its decision on multiple bases. First, it held that the difficulties experienced by Trivestco with its gas purchaser "triggered the force majeure clause in the lease, thereby suspending any provision of the lease which would otherwise terminate it." The court also held that the "obligation to pay royalty is a covenant of a lease, not a condition," that "a forfeiture under the facts would represent a windfall to [Welsch]," and that the lease therefore should not be terminated for failure to pay shut-in royalties. Finally, the court held that because the cessation of production was temporary, never intended to be permanent, and occurred for only a reasonable time, the cessation did not warrant termination of the lease, applying the doctrine of temporary cessation of production rather than the specific lease provision governing cessation of production. Although the court refused to cancel the lease, the court granted judgment to Welsch for payment of shut-in royalties of $706.

Welsch timely appeals.

### Standards of Review

When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the

dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009). Where there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 240, 201 P.3d 680 (2009).

The interpretation and legal effect of a written contract are matters of law over which an appellate court has unlimited review. *Conner v. Occidental Fire & Cas. Co.*, 281 Kan. 875, 881, 135 P.3d 1230 (2006). Regardless of the district court's construction of a written contract, an appellate court may construe a written contract and determine its legal effect. *City of Arkansas City v. Bruton*, 284 Kan. 815, 828-29, 166 P.3d 992 (2007). These standards have application to the interpretation of oil and gas leases. *Lauck Oil Co. v. Breitenbach*, 20 Kan. App. 2d 877, 878, 893 P.2d 286 (1995).

### *Did the District Court Err in Holding the Shut-in Royalty Provision of the Lease to be a Covenant that Limited Welsch to a Judgment for Unpaid Royalties Instead of Lease Cancellation?*

At the outset of our analysis, it is critical to recognize that oil and gas law is not so much a unique body of law as it is a specialized application of contract law. The rights and obligations of those operating in the Kansas oil patch are governed by the terms and conditions of specialized contracts, and each dispute arising in this context can and should usually be resolved by the construction and application of such contracts. Although parties to such disputes often seek to rely on and argue the application of case law, we must decline to blindly apply what may appear to be legal principles within such precedent without a preliminary determination whether the contract provisions at issue in the cited authority are identical to those before us. This is particularly true in construing a shut-in royalty clause. See *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 662 P.2d 255 (1983).

Notwithstanding the importance of the particular lease terms and conditions, certain general characteristics of shut-in royalty clauses should be noted. The concept underlying such clauses is to enable a lessee, under appropriate circumstances, to keep a non-producing lease in force by the payment of the shut-in royalty and that such a clause by agreement of the parties creates constructive production. In this manner, the clause can modify and become an integral part of the habendum clause, or extension clause, of the lease. See *Pray*, 233 Kan. at 353. Our Supreme Court has provided a more detailed history and use of such clauses in *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 380-82, 855 P.2d 929 (1993).

Here, we begin our analysis by analyzing the shut-in royalty provisions of the subject lease. First, we note that the provisions are not a part of the habendum clause but rather are contained within the royalty clause. Second, we note that the provisions are stated in language indicating that such payments are optional; that is, the lease provides that the lessee "may" pay or tender such royalties rather than employing language of obligation. Third, we note that the provisions contain the saving clause that if such royalties are paid, "it shall be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities"; that is, payment of such royalties—if elected by the lessee—is obviously intended to relate to the habendum clause that preserves the lease in effect "as long thereafter as" production is achieved. Finally, we note that production from the lease was achieved during the primary term, and its cessation occurred well into the secondary term of the lease, where the habendum clause required production for the term of the lease to continue. These unique features of the shut-in royalty provisions are paramount to our construction and application of those provisions to the factual circumstances here.

Generally, reliable authorities recognize that an option to pay shut-in gas royalties—in contrast to an obligation to do so—can support cancellation where the optional royalties are not paid. Generally, such an option is considered to create a special limitation on the lease, and the failure to pay the shut-in royalties will terminate the lease. See Pierce, *Incorporating a Century of Oil and*

*Gas Jurisprudence Into the "Modern" Oil and Gas Lease*, 33 Washburn L.J. 786, 811 (1994). According to the foremost treatise authority, Williams & Meyers,

"[a]t first glance it might appear that lessees would prefer the optional to the obligatory form of this clause. However where the optional form is employed, the lease will provide, expressly or by implication, that the lease shall expire under the prescribed circumstances unless such optional payment is made. In a number of cases lessees have lost valuable leaseholds by reason of failure to make timely payment of the optional shut-in royalty payment. It is for this reason that many such clauses provide that a lease shall be preserved even though there is no production or operations on the premises if a well capable of producing is shut-in; such clauses impose a duty to pay shut-in royalty." 3 Williams & Meyers, Oil and Gas Law § 632.8, pp. 436-37 (2008).

See *Amber Oil and Gas Co. v. Bratton*, 711 S.W.2d 741, 743-44 (Tex. App. 1986) (optional language creates special limitation on the lease grant, and failure to pay the shut-in royalty when due results in termination); see also *Greer v. Salmon*, 82 N.M. 245, 247-51, 479 P.2d 294 (1970) (where optional rather than obligatory provision, failure to pay resulted in automatic termination); *Freeman v. Magnolia Pet. Co.*, 141 Tex. 274, 278-79, 171 S.W.2d 339 (1943) (optional character of payment coupled with the provision that it will be considered that gas is being produced if such payment is made indicates that advance payment is required to keep the lease alive).

Indeed, here the lease does provide "by implication" that it will expire absent such payment. In stating that "if such payments or tenders are made it shall be considered under all provisions of this lease that gas is being produced," the lease implies that if such payments are not made, the production requirement of the habendum clause is not satisfied by reason of the shut-in well. In the absence of production in paying quantities, the lease expires by its own terms. In construing a lease form that was apparently identical to the lease before us, the Texas Court of Civil Appeals held that failure to pay the shut-in royalties causes the lease to expire. The court expressed its reasoning as follows:

"According to the clause in the instant case, if a well is shut in, the lessee may pay an annual royalty equal to the amount of the delay rentals, in the same manner as payment of the delay rentals, and if such payment is made, it shall be considered

under all provisions of the lease that gas is being produced in paying quantities for one year from the date of payment. It was held in *Freeman v. Magnolia Petroleum Co.*, 141 Tex. 274, 171 S.W.2d 339 (1943), that the optional character of payment coupled with the provision that it will be considered that gas is being produced if such payment is made indicates that advance payment is required to keep the lease alive. [Citation omitted.]" *Marifarms Oil & Gas, Inc. v. Westhoff*, 802 S.W. 2d 123, 125-26 (Tex. App. 1991).

Here, the district court held that the shut-in provisions should be construed as a covenant rather than a condition or special limitation of the lease and, therefore, limited the lessor to money damages rather than lease termination. We respectfully disagree with this conclusion, not only because of the weight of the authorities cited above but because the phrase "may pay or tender" simply does not express any language of obligation. The term "may" is commonly understood to mean "is permitted to" in the discretionary or permissive sense. Black's Law Dictionary 993 (7th ed. 1999). Trivestco is unable to cite any Kansas case law to suggest that our courts have at any time recognized "may" as a term of obligation, and we find none as well. In contrast, our appellate courts have often recognized that the term "may" connotes only an option or an election. *State ex rel. Secretary of SRS v. Jackson*, 249 Kan. 635, 641-42, 822 P.2d 1033 (1991) (discussing the definitions of "shall" and "may" and stating that the word "may" is usually "employed to imply permissive, optional or discretional, and not mandatory action or conduct." The court stated that as a general rule the word "may" will not be treated as a word of command unless the context or subject matter indicates it should be treated as such.). We decline to construe the language of the clause here as a covenant.

Finally, the district court concluded that payment under the shut-in provisions here must be construed as a royalty rather than a rental and that the obligation to pay royalties is generally considered a covenant rather than a condition of the oil and gas lease, citing *Cherokee Resources, Inc. v. Gold Energy Corp.*, 11 Kan. App. 2d 436, 724 P.2d 695 (1986). We respectfully disagree that characterization of the shut-in payment (which was not made here) as a royalty is somehow determinative of the issue before us. In *Cherokee Resources*, a panel of our court was faced with a guar-

anteed minimum royalty clause in an oil and gas lease and addressed the question of who should pay such minimum royalties when the acreage covered by the lease was divided by assignment, and producing wells were located on only 80 acres within the 240-acre tract. The only clause at issue was a guaranteed royalty clause, and there was no claim or question about the impact of nonpayment on the lease. We simply do not view the decision in *Cherokee Resources* as in any way instructive or dispositive to the issues before us. Moreover, neither the characterization of a shut-in payment as royalty nor the location of shut-in provisions within the royalty provisions of a lease is determinative of any aspect of construction of such provisions other than questions related to who may be entitled to the proceeds from such payment. See 3 Williams & Meyers, Oil and Gas Law § 632.9, pp. 438-440.1.

In summary, the lease before us provided to Trivestco an option to pay shut-in royalty payments in order to allow the only well on the leased acreage to be "considered" to produce gas in paying quantities sufficient to satisfy the habendum clause and extend the lease in full effect. The language of the clause created a special limitation on the lease, and failure to exercise the option directly affected the life of the lease. It is beyond dispute that Trivestco did not exercise this option, and the result is that the shut-in royalty provisions of this lease did not preserve the lease and it expired by its own terms on May 22, 2005, unless some other aspect of the lease saved it from such expiration. We examine other lease clauses and potentially applicable doctrines to determine whether the lease was otherwise preserved.

### Did the District Court Err in Holding the Lease Was Preserved by the Doctrine of Temporary Cessation of Production?

Welsch argues the district court erred in generally applying the doctrine of temporary cessation of production as a legal basis to avoid expiration of the oil and gas lease. The doctrine has been recognized in Kansas as dictating that a mere temporary cessation of production because of necessary developments or operations do not result in the termination of the oil and gas lease, despite the

requirement of production to satisfy the habendum clause. See *Wilson v. Holm*, 164 Kan. 229, Syl. ¶ 6, 188 P.2d 899 (1948). So long as the cessation is temporary, the doctrine allows the lessee a reasonable time to recommence production in paying quantities. See *Wrestler v. Colt*, 7 Kan. App. 2d 553, 558, 644 P.2d 1342 (1982). Here, the district court determined that the cessation was temporary rather than permanent and that renewed production was achieved in a reasonable time, thus preserving the lease under the doctrine.

The problem with the court's rationale is best articulated by *amici curiae's* argument that the doctrine cannot be applied where the parties have expressly contracted for a particular result in the event of production cessation. Indeed, here the oil and gas lease contained express provisions governing temporary cessation of production, and the period for recommencement or additional development was specified to be 60 days. According to *amici curiae*:

"A producer simply cannot invoke the doctrine of temporary cessation to avoid complying with a provision that requires it to recommence production within a specified period of time. See Pierce, [Kansas Oil and Gas Handbook], at § 11.16 [1991] (cessation clause 'eliminate[s] the permanent/temporary cessation issue [by] substitut[ing] a definite time frame, such as 'within sixty (60) days . . . .'; [3] Williams & Meyers, [Oil and Gas Law], at §616.2, pp. 283-84 ('If the lease specifically provides that, in the event of cessation of production, it may be preserved by new operations commenced within some specific period of time (*e.g.*, 60 days), then it is difficult to support the contention that the lease may be preserved for a longer period of time without any drilling operations thereon by reason of the "temporary cessation of production" doctrine [ ] . . . .')."

We agree and adopt this reasoning and the authorities cited in support of our conclusion that the district court erred in applying the doctrine here in lieu of the express contract provision. The oil and gas lease provided that if production of gas ceases "from any cause," then the lessee had 60 days to commence reworking or additional drilling operations in order to prevent termination of the lease. The gas well at issue ceased producing and was shut in on August 31, 2004. In the absence of any record evidence that rework or additional drilling occurred prior to October 31, 2004, the lease was not subject to being preserved by the cessation of production clause within the lease.

Moreover, we note in passing that some authorities have suggested that a temporary cessation of production clause does not save a lease where the cessation could have been saved by the shut-in royalty provisions of the same lease.

"[T]he constructive production achieved by the payment of shut-in gas royalty is not the production to which the cessation of production clause applies and thus such clause would not apply to a cessation of constructive production that results from a failure to make payment of the shut-in gas royalty." 4 Kuntz, Oil and Gas § 47.3(f)(2), p. 112 (Thornton rev. 1990).

See also *Marifarms Oil & Gas*, 802 S.W.2d at 125-26 (if a lease contains both a cessation of production clause and a shut-in royalty provision, then to preserve the lease it is required to make the shut-in royalty payment within the time period stated in the cessation of production clause); *Duke v. Sun Oil Company*, 320 F.2d 853, 858-59 (5th Cir.), (the shut-in royalty payment must be paid within the time given in the cessation of production clause or else the lease terminates), *reh. granted on factual questions of proper anniversary date and timeliness of tender* 323 F.2d 518 (5th Cir. 1963).

Finally, we note that the district court considered equitable factors in determining whether to terminate the lease. We concede that the law abhors a forfeiture, but our Supreme Court has held that where an action is one to determine the continued validity of the lease under its own terms and not an equitable action to declare the forfeiture of an existing lease, the court has no power to extend a lease beyond the term which the parties have fixed by their written contract. *Reese Enterprises, Inc. v. Lawson*, 220 Kan. 300, Syl. ¶ 9, 553 P.2d 885 (1976). Accordingly, equitable factors, such as those recognized by *M & C Oil, Inc. v. Geffert*, 21 Kan. App. 2d 267, Syl. ¶¶ 3-5, 897 P.2d 191 (1995), are not applicable to the situation before us.

We conclude the district court erred in applying the doctrine of temporary cessation of production in lieu of the express provision in the lease governing the same eventuality. Here, the lease was certainly not preserved by the express temporary cessation of production clause because there was no recommencement or addi-

tional drilling activity within the 60 days specified and agreed within the lease.

### Did the District Court Err
### In Applying the Force Majeure Clause
### To Preserve the Oil and Gas Lease

Finally, Welsch argues that the district court improperly applied the force majeure provisions of the oil and gas lease to avoid its expiration. The district court held that the difficulties with the gas purchaser, including bankruptcy, were "factual events [that] triggered the force majeure clause in the lease, thereby suspending any provision of the lease which would otherwise terminate it." Again, we respectfully disagree.

First, we note that the bankruptcy of a purchaser is generally covered by the shut-in royalty clause, not the force majeure clause. Pierce, Kansas Oil and Gas Handbook § 11.18, p. 11-20 (1991) (a lessee seldom has control over the demand for production from a well, and this is why the shut-in royalty clause was devised); see also *United States v. Panhandle Eastern Corp.*, 693 F. Supp. 88, 96 (D. Del. 1988) (surveying the law regarding the question whether market forces may constitute force majeure and concluding that courts generally refuse to excuse performance under such a theory); *Champlin Petroleum Co. v. Mingo Oil Producers*, 628 F. Supp. 557, 560-61 (D. Wyo. 1986) (bankruptcy proceedings of lessee's subassignee did not constitute force majeure but inherently the result of financial problems). For these reasons, we are not convinced the financial issues of a gas purchaser should be considered a force majeure event under this lease.

More importantly, however, we note that even if the unavailability of purchasing and transportation services would constitute a force majeure event under the express provisions of the lease, the clause simply does not excuse the failure to pay shut-in royalties. The clause states that "lessee shall not be·liable for delays or defaults in its performance of any agreement or covenant hereunder *due to* force majeure." (Emphasis added.) The performance default that caused the lease to expire was the failure to pay shut-in royalties, and that default was not due to any force majeure event.

In the context of legal instruments, the phrase "due to" has long been synonymous with the phrases "caused by," "because of," and "resulting from." See Black's Law Dictionary 501 (6th ed. 1990); Webster's Third New International Dictionary 699 (1993); *Federal Life Ins. Co. v. White*, 23 S.W.2d 832, 834 (Tex. Civ. App. 1929).

In order for the force majeure clause to prevent the lease from terminating, the default (failure to pay shut-in royalties) must be the result of the force majeure event, here the unavailability of gas purchasing services. The unavailability of such purchasing and transporting services simply did not prevent Trivestco from paying shut-in royalties; therefore, the force majeure clause was not triggered.

The district court erred in determining that the force majeure clause was triggered because of the unavailability of purchasing and transportation services. Even if unavailability of services had been a force majeure event, the failure to exercise an option to pay shut-in royalties was not due to this purported force majeure event; thus the clause has no application here.

### Summary and Conclusion

We have concluded that the oil and gas lease at issue expired by its own terms when production from the only producing well on the acreage ceased due to financial failure of the gas purchaser, the well was shut in, production was not recommenced nor was additional drilling achieved within the 60 days required under the lease, shut-in royalty payments were not paid on or before May 22, 2005, and the failure to pay or tender such shut-in royalty payments was not due to any force majeure event. For these reasons, the district court must be reversed and the matter remanded with directions to enter judgment of lease cancellation to lessor Welsch.

Reversed and remanded with directions.