1020

(269 P.3d 846)
No. 104,457

MARGARET JANE DEXTER, SUCCESSOR TRUSTEE OF THE WILLIAM WAYNE DEXTER REVOCABLE TRUST UTA DATED MARCH 31, 1999; MARGARET JANE DEXTER, TRUSTEE OF THE MARGARET JANE DEXTER REVOCABLE TRUST UTA MARCH 31, 1999; and KENNETH W. NELSON and HELEN O. NELSON, *Appellees*, v. JOE F. BRAKE and WANDA BLANKINSHIP, *Appellants*. DAVID L. MONROE, *Appellee*, v. JOE F. BRAKE and WANDA BLANKINSHIP, *Appellants*.

1022

Opinion filed January 20, 2012.

*Thomas M. Rhoads*, of Glaves, Irby and Rhoads, of Wichita, for appellants.

*John R. Horst*, of John R. Horst, P.A., of Caney, for appellees.

Before ARNOLD-BURGER, P.J., MALONE, J., and DANIEL L. HEBERT, District Judge Retired, assigned.

ARNOLD-BURGER, J.: We are asked to decide several issues in this dispute over an oil and gas lease (Lease) between Joe Brake and Wanda Blankinship (Brake), the lessees, and Margaret Jane Dexter, Successor Trustee of the William Wayne Dexter Revocable Trust and Trustee of the Margaret Jane Dexter Revocable Trust (Dexter); Kenneth W. Nelson and Helen O. Nelson (Nelson); and David Monroe (Monroe), the lessors.

1. Dexter and Nelson were parties to a lawsuit against Brake previously decided by this court in *Dexter v. Brake*, 38 Kan. App. 2d 1005, 174 P.3d 924 (2008) (*Dexter I*), for cancellation of the Lease. After success in *Dexter I*, Dexter and Nelson sued Brake for trespass, conversion, and an accounting of income from gas and oil sales because Brake has continued unabated with his oil and gas production on their properties. Brake asserts the lawsuit is either barred by res judicata, because the claims should have been raised in *Dexter I*, or the statute of limitations, because it was brought more than 2 years after the cancellation of the Lease. We find Brake's arguments have no application here. The claims are not precluded because the things sued for and the causes of action are different in each lawsuit, which prevents the application of res judicata. As for Brake's statute of limitations argument, Brake's actions constituted a continuing trespass on the property which failed to implicate the statute of limitations.

2. In a case consolidated with the above claims, Monroe successfully sued Brake to cancel the Lease as it relates to Monroe's interest. Brake asserts that there was insufficient evidence for the trial court to determine that the Lease should be cancelled as to Monroe's ½ mineral interest in the Dexter land. We find the trial court's decision to cancel the Lease was supported by substantial competent evidence.

3.  Finally, because the Lease was previously cancelled in *Dexter I* as to the Dexter and Nelson interests, Brake is entitled to recover a proportionate share of his reasonable operating expenses associated with the oil and gas production from the land after the Lease was cancelled. The question raised here is how much and from whom. Brake argues the trial court improperly disallowed some expenses and erroneously found that no expenses should be apportioned against the Nelson land. We find no error in the trial court's exclusion of recovery for litigation expenses, expenses for which there was insufficient evidence, and expenses incurred prior to the cancellation of the Lease. But we find that Brake was a good-faith trespasser during the pendency of the appeal in *Dexter I* and the trial court erred in failing to assess a proportionate amount of the approved expenses against the Nelson land.

Accordingly, we affirm the decision of the trial court on all issues except the failure to apportion any of the approved operating expenses to the Nelson land. We remand the case to the district court to appropriately apportion expenses consistent with this opinion.

### FACTUAL AND PROCEDURAL HISTORY

Dexter and Nelson own two separate tracts of land in Chautauqua County, Kansas (Dexter land and Nelson land). Before their purchases, the tracts were part of a larger parcel of 520 acres that had been subject to the Lease since 1964. Nelson owns all of the mineral interest in 280 acres. Dexter owns a ½ mineral interest in 240 acres, with Monroe owning the other ½ mineral interest. The Lease was assigned to Brake in 1995. Brake has a ⅞ working interest in the Lease, and the remaining ⅛ royalty interest is shared by Dexter, Monroe, and Nelson based on their respective interests in the land. In November 2002, a grass fire occurred on the property damaging most of the production facilities on both the Dexter and Nelson tracts. In late 2003, because of the cessation of production that resulted from the fire, Dexter, Nelson, and Monroe demanded that Brake release the Lease because the Lease terms had been broken. Subsequently, however, all parties agreed to rat-

ify the Lease through an addendum dated February 3, 2004. The pertinent parts of the addendum are as follows:

"2.    That Lessee place the gas well into production within 120 days of February 1, 2004 or plug it;

. . . .

"8.    That Lessee plug all wells on the leasehold not actually used for oil or gas production, disposal, or injection/enhanced recovery within 6 months after February 1, 2004; [and]

. . . .

"10.    Failure to comply with each of the conditions above set forth will result in termination of the oil and gas lease."

When Brake failed to comply with the addendum, Dexter and Nelson brought an action to cancel the Lease. Monroe was not a party to the lawsuit. Finding that the uncontroverted facts established a breach of the addendum, on June 12, 2006, the trial court granted summary judgment and cancelled the Lease. The trial court also found that Monroe was not a necessary party to the action. Brake appealed, and on January 25, 2008, this court entered its decision affirming the trial court's cancellation of the Lease as to the Dexter and Nelson interests. Furthermore, this court indicated that while Brake was no longer allowed to explore and produce oil or gas on the Nelson land, Dexter was still required to allow Brake to enter onto the Dexter land to fulfill his obligation to Monroe's ½ mineral interest in the Dexter land. *Dexter I*, 38 Kan. App. 2d at 1016-21. Despite this court's ruling, Brake continued to operate the wells on both the Nelson and Dexter tracts.

In late 2006, Dexter and Nelson filed a petition against Brake requesting an accounting from Brake of all the oil sold under the Lease after August 1, 2004 (the date the Lease was deemed terminated/cancelled). In addition, Nelson alleged that Brake committed trespass and conversion on the Nelson land by continuing to produce oil from the land despite the Lease's cancellation.

In early 2007, Monroe filed a petition against Brake for cancellation of the Lease as to his ½ mineral interest in the Dexter land and for an accounting of all the oil produced after August 1, 2004.

The Dexter-Nelson lawsuit and the Monroe lawsuit were consolidated at Brake's request.

A bench trial was held. The trial court found that the facts supported a finding of a material breach of the terms and provisions of the addendum and cancelled the Lease as to Monroe's ½ mineral interest in the Dexter tract.

In addition, the trial court found that the value of the oil produced and sold after the August 1, 2004, cancellation date from both the Nelson and Dexter tracts was $264,982.95. The court was then required to determine the reasonable operating expenses since August 1, 2004, finding Brake would be entitled to those expenses. Brake claimed reasonable operating expenses of $258,138.14, while Dexter, Nelson, and Monroe argued that allowable expenses totaled only $86,584.16. After a review of the expenses, the court concluded that Brake was entitled to $186,631.77 in operating expenses. The court was then tasked with apportioning the expenses between Dexter, Monroe, and Nelson based on their respective interests in the land. It determined that Brake could not recover any expenses from Nelson because the Lease had been cancelled regarding that entire tract.

Brake appeals the trial court's decision, arguing that (1) either the doctrine of res judicata or the statute of limitations bar the Dexter and Nelson claims for conversion and trespass; (2) cancellation of the Lease as to Monroe was unsupported by the record; and (3) the trial court failed to credit Brake for all of his reasonable operating expenses and erred in how it allocated the expenses it did assess.

## THE DEXTER-NELSON LAWSUIT IS NOT BARRED BY RES JUDICATA OR THE APPLICABLE STATUTE OF LIMITATIONS.

Brake contends that the Dexter-Nelson lawsuit is barred by the doctrine of res judicata (or claim preclusion). Specifically, Brake asserts that because Dexter and Nelson failed to bring the trespass, conversion, and accounting claims in their first lawsuit against Brake for cancellation of the Lease, then they are precluded from doing so in this lawsuit. In addition, Brake argues that the Dexter and Nelson claims for trespass and conversion were barred by the statute of limitations under K.S.A. 60-513(a). The trial court denied both claims.

*Res Judicata*

Whether the doctrine of res judicata applies in a certain situation is an issue of law over which appellate courts exercise de novo review. *Rhoten v. Dickson*, 290 Kan. 92, 106, 223 P.3d 786 (2010).

" 'The doctrine of res judicata (or claim preclusion) prohibits a party from asserting in a second lawsuit any matter that might have been asserted in the first lawsuit.' [Citation omitted.]" *Winkel v. Miller*, 288 Kan. 455, 468, 205 P.3d 688 (2009). Res judicata prevents relitigation when the following conditions concur: (1) identity in the thing sued for, (2) identity of the cause of action, (3) identity of persons and parties to the action, and (4) identity in the quality of persons for or against whom claim is made. *Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 1023, 58 P.3d 1284 (2002).

Because the third and fourth elements for claim preclusion have been met, we limit our examination to the first and second elements.

The first requirement for claim preclusion is the identity of the thing sued for. In the first lawsuit between the parties, Dexter and Nelson merely asked for the cancellation of the Lease as to their respective rights. See *Dexter I*, 38 Kan. App. 2d 1005. Brake does not point to, nor does the record indicate, that Dexter and Nelson sued for trespass, conversion, or an accounting in their first lawsuit against Brake. Thus, Brake cannot meet the first requirement for claim preclusion because he cannot show that the identity in the things sued for in both lawsuits concurred. Suing for lease cancellation and suing for trespass, conversion, and an accounting of proceeds are exceedingly different.

The second requirement for claim prelusion is identity of the cause of action. In the first lawsuit, again, Dexter and Nelson brought their claim under contract theory, while their second lawsuit falls under tort theory. " 'In Kansas the rule of *res judicata* is not binding and does not apply to a different claim for relief even though it may be between the same parties.' [Citations omitted.]" *Baca v. Walgreen Co.*, 6 Kan. App. 2d 505, 518, 630 P.2d 1185 (1981), *aff'd in part, rev'd in part on other grounds* 230 Kan. 443, 638 P.2d 898, *cert. denied* 459 U.S. 859 (1982). "The test for de-

termining whether the claims for relief are the same is whether the primary right and duty and delict or wrong is the same in each action. [Citation omitted.]" 6 Kan. App. 2d at 518.

In the first lawsuit, the primary right asserted by Dexter and Nelson was that the Lease should be cancelled, which in turn would give them the sole right to mine for and produce minerals on their lands. The primary wrong was that Brake failed to abide by the requirements in the addendum as agreed to by the parties, which in turn would justify the cancellation of the Lease. The action under the first lawsuit was commenced under contract theory.

Now that the Lease is cancelled, in the present lawsuit the primary rights asserted by Nelson are that for the sole right to explore for and produce oil or gas on the land without the intrusion of Brake, and the right to payment for the conversion of the oil and gas produced after the Lease was cancelled. The primary wrong is that Brake, despite the cancellation of the Lease, continued to intrude upon the Nelson land to operate the wells thereon and wrongfully converted the oil and gas produced from the wells on the Nelson land during the time of Brake's trespass.

In addition, the Dexter and Nelson claims for an accounting of the proceeds of the oil and gas produced from their lands are a request for a determination of who owns what amount of oil or gas produced from the land after the Lease was terminated. Again, this cause of action does not concur with the cause of action for the cancellation of the Lease from the first lawsuit.

Therefore, Brake's argument that res judicata bars the Dexter-Nelson claims for trespass, conversion, and an accounting of the proceeds fails.

*Statute of Limitations*

Brake contends that the Dexter and Nelson claims for trespass and conversion are barred by the statute of limitations under K.S.A. 60-513(a). He asserts that the alleged trespass and conversion began on August 1, 2004, when the Lease had actually terminated between the parties. Dexter and Nelson did not file their trespass and conversion claims until September 7, 2006, which would have been over 2 years after the alleged trespass and conversion began.

Conversely, Dexter and Nelson contend that the statute of limitations for trespass and conversion did not begin to run until June 12, 2006, when the trial court ordered the Lease cancelled. Thus, they filed their trespass and conversion claims well within the time allotted.

Appellate courts have unlimited review over questions concerning the interpretation and application of a statute of limitations. *Smith v. Graham*, 282 Kan. 651, 655, 147 P.3d 859 (2006).

Under K.S.A. 60-513(a) and (b), the statute of limitations for claims of trespass and conversion requires that the claims must be brought within 2 years, and the time begins to accrue when "the act giving rise to the cause of action first causes substantial injury." In this case, Brake's status as a trespasser was not determined until the trial court found on June 12, 2006, that the Lease should be cancelled. Dexter and Nelson filed their trespass claims on September 7, 2006, well within the 2-year statute of limitations.

Moreover, Kansas courts have recognized a distinction between a continuing trespass and a permanent trespass. See *Sullivan v. Davis*, 29 Kan. 28, 34 (1882) (interpreting a prior but similar version of K.S.A. 60-513). "[A] continuing trespass occurs when there is some continuing or ongoing tortious activity attributable to the defendant, while a permanent trespass occurs when the defendant's tortious act has been fully accomplished." 75 Am. Jur. 2d, Trespass § 19, p. 32. In the case of a continuing trespass, the statute of limitations does not begin to accrue until the continuing trespass is complete. *Sullivan*, 29 Kan. at 34.

In this case, Brake continued to operate the wells on the Nelson land up to the time Dexter and Nelson filed their petition in this lawsuit. Brake's actions presented a continuing and ongoing tortious activity upon the Nelson land because he continued to operate the wells on the Nelson land even after the trial court deemed and ordered the Lease cancelled. Brake was still operating the wells on the land at the time the petition was filed. As stated above, completion of the continuing trespass is required in order for the statute of limitations to accrue.

Therefore, the Dexter-Nelson petition was not time barred because Dexter and Nelson brought their claims within 3 months of

the trial court's decision terminating the Lease. It was the Lease cancellation that served to legally recognize Brake's status as a trespasser. And Brake's trespass was a continuing trespass which fails to implicate the statute of limitations until it is completed.

### THE TRIAL COURT DID NOT ERR WHEN IT CANCELLED THE LEASE AS TO MONROE'S ½ MINERAL INTEREST IN THE DEXTER LAND.

Brake contends that the trial court erred in determining that the Lease was cancelled as to Monroe's ½ mineral interest in the Dexter land. Brake asserts that the cancellation of the Lease was unsupported by the evidence presented at the bench trial.

"The rights and obligations of those operating in the Kansas oil patch are governed by the terms and conditions of specialized contracts, and each dispute arising in this context can and should usually be resolved by the construction and application of such contracts." *Welsch v. Trivestco Energy Co.*, 43 Kan. App. 2d 16, 21, 221 P.3d 609 (2009), *rev. denied* 291 Kan. 917 (2010).

Whether the lessee has performed his or her duties under the contract is a question of fact. *Adolph v. Stearns*, 235 Kan. 622, 626, 684 P.2d 372 (1984). The lessor who alleges a breach of the contract has the burden to show by substantial competent evidence that the lessee has breached the agreement. 235 Kan. at 627. "Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined." *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009). In determining whether there was sufficient evidence to support the trial court's finding, we do not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, it will be upheld. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1195, 221 P.3d 1130 (2009).

After the November 2002 fire on the property caused damage to the oil and gas production equipment, the Lease became inoperable. In November 2003, Dexter, Nelson, and Monroe demanded that Brake release the Lease because the Lease terms had

been broken, mainly that production was not occurring. However, all parties agreed to ratify the Lease through the addendum, dated February 3, 2004. The pertinent parts of the addendum are as follows:

"2.   That Lessee place the gas well into production within 120 days of February 1, 2004 or plug it;

. . . .

"8.   That Lessee plug all wells on the leasehold not actually used for oil or gas production, disposal, or injection/enhanced recovery within 6 months after February 1, 2004; [and]

. . . .

"10.   Failure to comply with each of the conditions above set forth will result in termination of the oil and gas lease."

Of the many wells on the lands, there are three wells which Monroe argued Brake failed to maintain according to the requirements of the addendum: wells #3, #8, and #13, thereby resulting in a breach of the Lease. We address each in turn.

*Well #8*

Well #8 is commonly referred to as the gas well. The second paragraph of the addendum refers to well #8. The addendum required Brake to place well #8 into production within 120 days of February 1, 2004, which would have been May 31, 2004. The use of the word "production" for the purposes of oil and gas leases implies some element of profit or production in paying quantities. Anderson, Dzienkowski, Lowe, Peroni, Pierce & Smith, Hemingway Oil and Gas Law and Taxation § 6.4, p. 252 (4th ed. 2004) ("[T]here must be some element of profit to the lessee, that the term 'production' means 'paying production' or 'production in paying quantities.' "); see also *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 353, 662 P.2d 255 (1983) ("Although the phrase 'in paying quantities' does not specifically appear in oil and gas leases, it is implicitly a part of the habendum clause."). This definition is important when considering the respective positions of the parties as to whether this provision of the addendum was breached.

At the bench trial and at his deposition, Brake testified that no natural gas had been sold from well #8, but that natural gas and oil had been produced from well #8. However, Brake testified that

he had not signed a gas-purchase contract to sell the gas from well #8, but that he was in the midst of negotiations. He agreed that a gas-purchase contract was necessary to place well #8 into production. Furthermore, Brake discontinued attempting to put in a gas pipeline for well #8 because Dexter and Nelson requested that he stop using a backhoe. But also according to Brake's testimony, a letter from Dexter and Nelson requesting that he stop laying a gas pipeline was sent after the 120 days provided in the addendum had expired.

*Well #13*

Well #13 was a marginally producing oil well. Paragraph 8 of the addendum applied to well #13, and if the well was not used for the production of oil or gas, disposal, or injection/recovery purposes, then the well was to be plugged within 6 months after February 1, 2004. Well #13 was a temporarily abandoned well. Brake testified that he had taken the motor off of well #13 for use on another well. In addition, Brake testified that as of February 1, 2004, he could get some oil out of the well if he spun it by hand. Brake admitted that he had not used well #13 for oil and gas production since February 1, 2004, and that he did not plug the well within 6 months of February 1, 2004, as required by the addendum.

*Well #3*

Well #3 was an observation well, and Brake testified that it would have been a terrible decision to plug well #3. Paragraph 8 of the addendum also applied to well #3, and if the well was not used for the production of oil or gas, disposal, or injection/recovery purposes, then the well was to be plugged within 6 months after February 1, 2004. Brake testified that well #3 produced oil before the fire. He testified that well #3 was temporarily abandoned and that it had not produced oil or been pumped since February 1, 2004, but that it had been operated on. In addition, Brake testified that he had not done any work on well #3 other than opening the valve to see if there was any pressure on it. Brake specifically testified that well #3 had not been used for oil or gas production, disposal,

or injection/recovery purposes within the 6 months after February 1, 2004, and that well #3 had not been plugged.

*Brake's failure to maintain wells; breach of addendum*

There is substantial evidence to support the trial court's finding that Brake failed to comply with the obligations contained in the addendum. Wells #8, #13, and #3 were never placed into production. Furthermore, the wells were not used for disposal or for injection/recovery purposes, and they were not plugged within the timeframe required. Although the evidence supports Brake's contention that Dexter and Nelson requested he discontinue use of the backhoe to prepare well #8 for production, this did not prohibit Brake from using some other method of trenching. In addition, the evidence suggests that the Dexter and Nelson request for Brake to discontinue use of the backhoe did not occur until after the 120 days required under the addendum had passed.

Finally, Brake specifically admitted that he had not produced any oil or gas from well #13 or well #3 and did not plug well #13 or well #3 within 6 months after the addendum was signed.

But Brake asserts that these breaches should be excused because he substantially performed what was required of him under the addendum.

Under contract law, the doctrine of substantial performance provides that the performance may still be considered complete if the essential purpose of the contract is accomplished and a party to the contract has made a good-faith attempt to comply with the terms of the agreement even though he or she fails to precisely meet the terms of the agreement. See Black's Law Dictionary 1566 (9th ed. 2009). "[It] is intended to protect the right to compensation of those who have performed in all material and substantive particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects." 15 Williston on Contracts § 44:52, p. 220-21 (4th ed. 2000). The doctrine of substantial performance does not apply where the parties, by the terms of their agreement, make it clear that only complete performance will be satisfactory. *Cambridge Tech. v. Argyle*, 146 Md. App. 415, 431, 807 A.2d 125 (2002); 15

Williston on Contracts § 44:53, p. 224. Likewise, substantial performance is in direct contrast to the concept of material breach. *Almena State Bank v. Enfield,* 24 Kan. App. 2d 834, 838, 954 P.2d 724 (1998). If a breach is material, substantial performance has not been rendered. 24 Kan. App. 2d at 838. A material breach is one in which the promisee receives something substantially less or different than he or she bargained for. 24 Kan. App. 2d at 838.

In this case, the main objective of the addendum was to get all of the wells back into production or plugged after the fire in November 2002. So making sure that all of the wells were either producing or plugged was a material part of the addendum agreement. Because Brake failed to place wells, #8, #13, and #3 into production or plug them as was required by the addendum, he materially breached the addendum; thus, in turn, Brake failed to substantially perform the terms of the addendum. In addition, the addendum specifically provided at paragraph 10 that "[f]ailure to comply with each of the conditions above set forth will result in termination of the oil and gas lease."

Because there was substantial evidence to support a finding that Brake failed to abide by the requirements as set out in the addendum, the trial court did not err in finding that the Lease should be deemed terminated and cancelled as to Monroe's ½ mineral interest in the Dexter land as of August 1, 2004.

### THE TRIAL COURT DID NOT ERR IN ITS ASSESSMENT OF BRAKE'S REASONABLE AND NECESSARY OPERATING EXPENSES.

When an oil and gas lease is in effect, the leaseholder negotiates the amount of the royalty and then undertakes all the expenses. Therefore, when a lease is in effect the parties are not concerned about expenses. But when a lease is cancelled and the leaseholder continues production, the leaseholder *may* be entitled to recoup his or her reasonable and necessary expenses. We will detail the allotment of expenses as to the parties in the next section, but first we will examine Brake's claim that the trial court erred in its assessment of operating expenses when it denied the payment of certain operating expenses.

When an oil and gas lease operator is entitled to the recovery of expenses, generally both direct and indirect expenses which are reasonably incident to the drilling, production, and marketing functions are recoupable. Hemingway Oil and Gas Law and Taxation § 5.1, p. 172. The operator bears the burden of proving his or her reasonable and necessary expenses. See *Johnson v. Gas Co.*, 90 Kan. 565, Syl. ¶ 2, 135 P. 589 (1913). It is a question of fact whether there has been sufficient evidence presented to support a particular claimed expense, and we review for substantial competent evidence. It is a question of law whether a claimed expense is an allowed operating expense and is subject to our unlimited review.

In its memorandum decision, the trial court allowed Brake $186,631.77 for the costs of maintenance and operation after the Lease was cancelled. The trial court excluded the costs of shut-in royalties paid to Monroe, Dexter, and Nelson; the legal fees; the licensing fees; miscellaneous labor expenses that were unsupported by the evidence; electric bills, lease supervision, and contract pumper expenses for 16 months; the purchase of equipment prior to August 1, 2004; and the expenses for reworking well #10 and the expenses for well #8, as they were incurred prior to August 1, 2004.

The only fee denial that Brake does not contest is the $831.25 licensing fee. We will examine each of the claimed expenses.

*Expenses incurred prior to August 1, 2004*

The Lease, in this case, was deemed cancelled as to all parties as of August 1, 2004. So any expenses incurred before that date would be the sole responsibility of Brake pursuant to the Lease. The trial court found the following expenses to have been incurred before the August 1 cancellation date; therefore, they were not recoupable.

*Shut-in gas royalties*

Brake claims he paid $6,000 for shut-in gas royalties to Dexter, Nelson, and Monroe. A shut-in gas royalty typically refers to an amount paid to the lessor by the lessee in exchange for an agreement to cease production of gas for a period of time, usually to

wait for a more favorable gas market. It is a contingency often provided for in the lease itself. See *Palmer v. Bill Gallagher Enterprises*, 44 Kan. App. 2d 560, 564, 240 P.3d 592 (2010), *pet. for rev.* filed October 25, 2010 (pending). Brake contends these expenditures were allowed by the Lease and therefore he should be entitled to reimbursement. Upon review of the Lease, there is a shut-in royalty provision which comes into play when gas is not sold or used, but whether said provision would apply at a time when the wells were actually inoperable is unclear. See *Levin v. Maw Oil & Gas*, 290 Kan. 928, 946-49, 234 P.3d 805 (2010) (general discussion of shut-in royalties). But assuming the royalty payments were consistent with the Lease as Brake argues, and not simply consideration for execution of the addendum in lieu of lease cancellation, the expenses were clearly incurred prior to August 1, 2004. Because the Lease was still in effect at the time of the payments, Brake was responsible for all expenses associated with the Lease and, accordingly, the trial court did not err in holding they were not recoverable operating expenses.

*Maintenance on Wells #8 and #10*

Brake asserts that the costs for equipment purchases, well reworking, and maintenance on wells #8 and #10 were necessary to restore the Lease to production and were legitimate operating costs. Again, there was substantial competent evidence presented that these expenses were incurred before August 1, 2004, the date the Lease was terminated, and therefore were not recoupable.

*Expenses for which there was insufficient evidence*

The trial court found that several claimed expenses were not supported by sufficient evidence. Finding a party did not meet his or her burden of proof is generally considered a negative factual finding. "Our standard of review for a negative finding of fact is that the party challenging the finding must prove arbitrary disregard of undisputed evidence or must prove some extrinsic consideration such as bias, passion, or prejudice." *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 781, 189 P.3d 508 (2008).

*Miscellaneous labor expenses*

Brake contends that the miscellaneous labor expenses paid to a contract pumper should have been honored as reasonable operating expenses. The trial court did not deem these expenses were unreasonable, but merely indicated that there was insufficient evidence from the record to support the expenses set out in Brake's type-written accounting documents. The trial court pointed out that the expenses were not supported by other documents, such as receipts for cash paid. Brake's documents also indicated that these expenses were made for an additional lease other than the Lease in this case. We do not need to determine whether these expenses were proper operating expenses as a matter of law. Brake fails to claim that the trial court arbitrarily disregarded undisputed evidence or exhibited bias, passion, or prejudice, and the record does not reflect otherwise. Therefore, the trial court did not err in disallowing these claimed expenses.

*Expenses that do not constitute recoupable operating expenses as a matter of law*

*Fixed costs to protect property after June 2008*

Brake next contends that the amounts paid for a contract pumper and lease supervision were necessary fixed costs for maintenance of the Lease equipment and to protect the property until a final determination could be made in this case. Brake requested 54 months (August 2004 to February 2009) of expenses for a contract pumper fee and a lease supervision fee. The trial court determined that only 38 months of these fees should be considered reasonable operating expenses. According to the electric bills and the date of the last bill of sale for oil from the Lease, there was no longer any production from the Lease as of June 2008. As Brake admits, the contract pumper fee and the lease supervision fee were for his sole benefit in protecting his property—the wells. Because the Lease was no longer profitable after June 2008, there was no benefit to the landowners for the continuation of a contract pumper or lease supervision. Therefore, we agree with the trial court's decision that the costs of the contract pumper fee and the

lease supervision fee were not recoverable operating expenses as soon as the Lease became unprofitable.

### Legal fees

Brake also contends that his legal fees were legitimate operating expenses for which he should be compensated. Brake does not point to any authority that allows legal fees as operating expenses. We are unable to locate any Kansas authority that includes legal fees for a current lawsuit as reasonable operating expenses. However, the Supreme Court of Kentucky has addressed this issue and found that legal fees incurred in litigation involving rights under an oil and gas lease form no part of the costs of production. *Swiss Oil Corporation v. Hupp*, 253 Ky. 552, 568-69, 69 S.W.2d 1037 (1934); see *Daly v. Smith*, 220 Cal. App. 2d 592, 603, 33 Cal. Rptr. 920 (1963) (holding that overhead costs such as legal fees are not recoverable). We agree with the trial court. Brake's legal fees associated with the litigation over the Lease are not recoverable operating expenses.

### THE TRIAL COURT DID ERR IN THE ALLOCATION OF BRAKE'S OPERATING EXPENSES.

The issue of allocation of expenses among the landowners and mineral interest holders is more complicated and involves an understanding of the relationship between the parties after the Lease is cancelled. We note that none of the plaintiffs filed cross-appeals regarding the allowed expenses or the allocation of expenses. So the only question before us regarding allocation of the expenses is whether reasonable operating expenses should have been assessed against the Nelson land.

As background, we first review the rights and responsibilities of the parties both before and after the Lease was cancelled.

### Before the Lease was cancelled

Nelson owned his tract of land and all the mineral interests therein. Dexter owned his tract of land and ½ of the mineral interests therein. The other ½ of the mineral interests belonged to Monroe, pursuant to a prior agreement between Monroe and Dexter. The Lease covers all of the land belonging to the parties and

was in effect before each party owned their particular tracts. Thus, Dexter, Nelson, and Monroe were all subject to the terms of the Lease.

In the case of an oil and gas lease, the mineral interest owners negotiate a lease agreement with an oil and gas producer which establishes the allocation of income from the wells located on the property. The mineral interest owners' stake in the income received from oil or gas actually produced at the surface, free of production expenses, is called a "royalty interest." The interest of the producer to exclusively drill, produce, and market the oil or gas on the land is called a "working interest." See *Reynolds-Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 845-46, 1 P.3d 909 (2000).

In this case, in return for the exclusive right to drill for oil and gas on the land, Brake received a ⅞ working interest, and Dexter, Nelson, and Monroe shared a ⅛ royalty interest. In addition, Nelson gave Monroe a ½ nonparticipating royalty interest in the mineral interest on the Nelson land. So any royalty interest payment that Nelson was entitled to on his land, Monroe was entitled to ½. Because expenses of exploration and drilling are part of the working interest, the lessee (Brake) bears all expenses, and the mineral interest owners bear none. Pursuant to the Lease, the lessors (Dexter, Monroe, and Nelson) were entitled to receive ⅛ of the market value of oil and gas produced from the mouth of the well. The ⅛ royalty interest was paid in proportion to the acreage they each owned.

*After the Lease was cancelled*

The Lease was deemed cancelled as of August 2004 as to Dexter and Nelson. See *Dexter v. Brake*, 38 Kan. App. 2d 1005, 174 P.3d 924 (2008) (*Dexter I*). Once a lease is cancelled, there is no more division of interests between the parties. In this case, as a result of the decision in *Dexter I*, which did not include Monroe, Brake no longer had an agreement for the payment of royalties to Dexter and Nelson. He still clearly had a right to be on the Dexter property because he still had an agreement with Monroe. See *Dexter I*, 38 Kan. App. 2d at 1016-17 (stating that Dexter must continue to

tolerate Brake's presence on his land to the "extent necessary for development of the Monroe's mineral interest"). Yet Brake continued to operate the wells on both properties and market the oil and gas he acquired from both properties. He continued to pay royalties to Dexter, Monroe, and Nelson.

*Operating expenses on the Dexter land after Lease cancellation*

Once an oil and gas lease has been cancelled, we look to the law of cotenancy to determine what rights and responsibilities existed as between Brake and Dexter. Brake was still allowed on the land because Monroe had a ½ mineral interest in the Dexter land and the Lease was still valid as to Monroe's interest. But because Dexter was no longer a lessee, he was a nonjoining cotenant. Accordingly, both parties agree that Brake should be allowed the reasonable costs and expenses of operating the wells on the Dexter land. See *Krug v. Krug,* 5 Kan. App. 2d 426, 428-31, 618 P.2d 323 (1980), *rev. denied* 229 Kan. 670 (1981). The allocation of expenses to Dexter was not challenged on appeal.

*Operating expenses on the Nelson land after Lease cancellation*

The trial court held in *Dexter I* that because the Nelson portion of the Lease was cancelled as of August 1, 2004, Brake no longer had any right to operate wells on or produce oil or gas from the Nelson property; therefore, Brake was not entitled to recoup any operating expenses from Nelson after August 1, 2004. The trial court determined that Brake was not a good-faith trespasser. Brake contends this was error for reasons we will set forth more fully below.

The fact that Brake was a trespasser on the Nelson tract was not disputed. The issue is whether Brake was a good-faith trespasser or a bad-faith trespasser. This is also a mixed question of law and fact.

A good-faith trespasser is an individual who has an honest and reasonable belief in the superiority of his or her title. 1 Williams & Meyers, Oil and Gas Law § 226.3 (2010). Because the minerals are still owned by the mineral interest owner, if a producer lawfully extracts the minerals and delivers them to the mineral owner, jus-

tice requires the mineral owner to reimburse the producer for a proportionate share of the expenses of extraction; otherwise the mineral owner would be unjustly enriched at the producer's expense. *Krug*, 5 Kan. App. 2d at 429. So a good-faith trespasser is allowed to offset the costs of drilling and operating the wells against the proceeds of the sale of the oil and gas. Hemingway Oil and Gas Law and Taxation § 4.2, p. 153 (4th ed. 2004). These are referred to as *net profit damages*. See *Exxon Corp. v. Miesch*, 180 S.W.3d 299, 324 (Tex. App. 2005), *aff'd in part, rev'd in part on other grounds Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194 (Tex. 2011); 38 Am. Jur. 2d, Gas & Oil § 307, p. 713.

Accordingly, if Brake is considered a good-faith trespasser, Nelson is only entitled to net profit damages, and Brake would be able to recover a proportionate amount of his approved expenses from Nelson.

A bad-faith trespasser is a converter of the oil and gas produced. A simplistic way of viewing the distinction is to say that a good-faith trespasser reasonably believes he or she is right, while a bad-faith trespasser knows he or she is wrong. See *Swiss Oil Corporation*, 253 Ky. at 555. Bad-faith trespassers are held strictly accountable for their misappropriation of another's property and are liable to the rightful owner for the entire enhanced value of the oil and gas produced at the surface. In other words, the bad-faith trespasser is not allowed to offset the costs of drilling and operating the wells against the proceeds from the sale of the oil and gas. 1 Williams & Meyers, Oil and Gas Law § 226.1 (2010). These are referred to as *enhanced value damages*. Thus, if Brake is a bad-faith trespasser, as the trial court effectively held, then he cannot offset any of the costs to operate the wells located on the Nelson land, and Nelson would be entitled to the enhanced value damages that he was awarded by the trial court.

Brake argues he was a good-faith trespasser because he relied on the entirety clause in the Lease. Brake contends that even though the trial court's decision in *Dexter I* severed any rights he had to the Nelson tract, he was still required to access and operate facilities located on the Nelson tract in order to address Monroe's interest on the Dexter land until such time as Monroe's interest

was cancelled. He was allowed such access, he contends, pursuant to the entirety clause in the Lease, which provided:

"If the leased premises are now or hereafter owned in severalty or in separate tracts, the premises, nevertheless, may be developed and operated as an entirety, and the royalties shall be paid to each separate owner in the proportion that the acreage owned by him bears to the entire leased area. There shall be no obligation on the part of the lessee to offset wells on separate tracts into which the land covered by this lease is now or may hereafter be divided by sale, devise, or otherwise, or to furnish separate measuring or receiving tanks for the oil produced from such separate tracts."

This clause, he argues, granted him permission to operate the existing wells situated on the Nelson land in order to preserve and pursue Monroe's interests in the Lease. To fully understand Brake's position, we must examine the meaning and application of the entirety clause in Kansas.

The general rule in Kansas, often called the nonapportionment rule, is as follows:

"When a tract of land upon which an oil and gas lease has been given is subsequently divided into different ownerships, the owners of separate parcels or mineral interests are only entitled—in the absence of specific provisions or agreements to the contrary—to the royalties accruing from production on the particular tract to which their ownership attaches." *Carlock v. Krug*, 151 Kan. 407, Syl. ¶ 1, 99 P.2d 858 (1940).

This rule, however, is often seen as objectionable to the owners of tracts that do not contain any wells. To protect their interests in the minerals beneath their land, these owners tend to want to construct additional wells on their property, which results in additional expenses to the lessee, requiring the duplication of equipment and constant pressure from the landowners to provide uniform production among the various tracts. So a lease clause called an "entirety clause" has been developed to address this problem. See *Ruthven & Co. v. Pan American Petroleum Corporation*, 206 Kan. 639, 643-44, 482 P.2d 28 (1971). Such clauses provide that when a landowner sells a portion of the land subject to an oil and gas lease, the purchaser is entitled to participate in royalties derived from the oil or gas produced on any part of the land subject to the lease in proportion to his or her share of ownership or acreage.

*Brubaker v. Branine*, 237 Kan. 488, Syl. ¶ 2, 701 P.2d 929 (1985). So even if a tract contains no wells, the lessor is still entitled to a royalty from production of the wells located on the other tracts in proportion to the lessor's acreage as it relates to the whole acreage of the original undivided lease. The new *inside* property lines established by division of the original fee ownership do not affect the lessee's duties of development and operation of the lease as a single unit or in its *entirety*.

So because the Lease in this case contained an entirety clause, Brake argues that as long as the Lease remained in effect as to *any* of the lessors, he was allowed to ignore the inside property lines and continue to operate the Lease as a whole; and in fact, he was required by the Lease to do so for the benefit of Monroe. The cessation of production on the Nelson tract would diminish Monroe's royalty payment and render the entirety clause meaningless as to Monroe, even though his interest under the Lease remained intact. Brake buttresses his argument by highlighting that Nelson neglected to object to Brake's continued operations on his land and continued to accept royalty payments as well as other benefits.

We find that Brake was a good-faith trespasser because he had an honest and reasonable belief in the superiority of his title. He had a valid lease in effect at the time the lawsuit in *Dexter I* was filed against him. And although we are not asked to, nor do we need to decide the applicability of an entirety clause when an oil and gas lease has been cancelled as to some but not all of the lessors, we do find that Brake relied in good faith on his belief that he had a continuing responsibility to Monroe under the entirety clause of the Lease. Finally, Brake's actions also inured to the benefit of Dexter and Nelson as he continued to pay royalties to them as well as Monroe, further indicating an "honest intention to abstain from taking any unconscientious advantage of another." See *Sapulpa Petroleum Co. v. McCray*, 136 Okla. 269, 270, 277 P. 589 (1929).

But how long can a trespasser continue to claim good-faith status? Did Brake lose his good-faith status when the petition in *Dexter I* was filed, clearly putting him on notice that his interest in the Lease may be in jeopardy? Did he maintain his good-faith

status until the trial court entered its final judgment on June 12, 2006, in *Dexter I*? Or did his status as a good-faith trespasser continue until this court entered its final decision in *Dexter I* on January 28, 2008? There are no Kansas cases that address this issue, so we seek guidance from other courts and treatises.

When a trespasser enters peaceably and subsequently a lawsuit is filed for trespass, the trespasser enjoys his or her good-faith status until a final judgment has been entered. See Hemingway Oil and Gas Law and Taxation § 4.2, p. 159; 1 Williams & Meyers, Oil and Gas Law § 226.3. In *Gulf Refining Co. v. United States*, 269 U.S. 125, 136-38, 46 S. Ct. 52, 70 L. Ed. 195 (1925), the United State Supreme Court held that final judgment in an oil and gas trespass case means final adjudication on appeal. The Court held that the character of the trespass did not change simply because the case was on appeal. Once the oil producer is in possession of the land in good faith, that status continued until final adjudication on appeal. 269 U.S. at 137. Likewise, the Supreme Court of Oklahoma has held that a producer who was a good-faith trespasser did not lose that status during the pendency of an appeal. Otherwise, appeal would always be at the producer's peril. See *Sapulpa*, 136 Okla. at 270.

The rational for such a rule appears sound. First, allowing a producer who is on the property in good faith with a colorable legal claim to remain on the property during the pendency of an appeal presents little harm to the landowner, who will at a minimum be allowed to recover net profit damages if successful. If unsuccessful, the landowner is still entitled to his or her royalty interest. On the other hand, the damage to the lessee may be great. An oil and gas producer has significant capital invested in the equipment used for production. If he or she were not allowed to enter onto property to protect this investment from deterioration and harm during the pendency of the appeal, the consequences may be permanent. In addition, the producer would suffer lost profits during the pendency of the appeal as other producers on or near the disputed tract would be allowed to access minerals beneath the disputed tract, while the lessee's wells remain dormant. If the lessee who is trespassing in good faith is successful on appeal, significant ex-

penses may be necessary to return dormant wells to operation. If unsuccessful, the lessee will still have to pay all net profits to the lessor. Therefore, we find that based on the facts of each case and absent a finding by the trial court that continued operation of the lease during the pendency of an appeal would result in significant and continuing damage to the lessor, a lessee does not automatically forfeit his or her status as a good-faith trespasser during the pendency of the appeal of an order cancelling an oil and gas lease.

Returning to the facts of this case, we note that in *Dexter I* this court indicated that the issue of whether Monroe was a necessary party to the action to cancel the Lease was "surprisingly complex and [has] divided legal authorities both within and among various jurisdictions." *Dexter I*, 38 Kan. App. 2d at 1012. If Monroe was a necessary party, Brake would prevail because the Lease cancellation action would not be able to move forward without him. So the appeal was certainly not frivolous and presented genuine and important legal issues. It was not until our decision in *Dexter I* that Brake was advised that Nelson was "entitled to full cessation of operations by [Brake]." 38 Kan. App. 2d at 1016. Likewise, Brake had an objectively reasonable belief that the entirety clause of the Lease required him to continue to operate the Lease on all tracts unless or until it was cancelled as to *all* lessors. Moreover, Brake continued to pay royalties to Nelson, and Nelson accepted these payments. Accordingly, we find that in this case Brake remained a good-faith trespasser until January 25, 2008. Any continued operations conducted by Brake after January 25, 2008, on the Nelson land were conducted in bad faith. Thus, we find the trial court erred in not assessing any operating expenses against the Nelson tract and remand to recalculate the award consistent with this opinion.

Affirmed in part, reversed in part, and remanded with directions.