IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 109,864

WILLIS L. ARMSTRONG and STEPHANIE J. PROHASKA,
*Appellants*,

v.

BROMLEY QUARRY & ASPHALT, INC., *et al.*,
*Appellees.*

SYLLABUS BY THE COURT

1.

Generally, a trespasser is one who enters the premises of another without any right, lawful authority, or express or implied invitation or license. Trespass requires an intention to enter upon the particular piece of land in question, irrespective of whether the actor knows or should know that he or she is not entitled to enter.

2.

Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.

3.

Trespass and conversion are subject to a two-year statute of limitations under K.S.A. 60-513(a)(1) and (2). Generally speaking, this limitations period commences when "the fact of injury becomes reasonably ascertainable to the injured party" as provided in K.S.A. 60-513(b). But K.S.A. 60-513(b) also contains a statute of repose, which provides that any tolling of the statute cannot exceed 10 years "beyond the time of the act giving rise to the cause of action."

1

4.

When the circumstances of a tort action involve both a trespass onto another's property and conversion of natural resources from that property, Kansas law authorizes different damage awards for the conversion depending on the willfulness of the trespasser's conduct. When acting in good faith, the trespasser may deduct operating expenses and the mineral rights holder is entitled only to net profit damages. But when the trespasser acts in bad faith, the holder receives enhanced value damages, which means no expenses are deducted. The burden of proof is on the trespasser to establish good faith.

5.

To demonstrate a good-faith trespass, the trespasser must prove an honest and reasonable belief in the superiority of the trespasser's legal title to the property in question.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 13, 2015. Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed September 9, 2016. Judgment of the Court of Appeals affirming in part, reversing in part, and remanding to the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, reversed in part, and remanded with directions.

*Allen A. Ternent*, of Ternent Law Office, of Atchison, argued the cause and was on the brief for appellants.

*Patrick R. Miller*, of Miller Law LLC, of Overland Park, argued the cause and was on the brief for appellees.

2

The opinion of the court was delivered by

BILES, J.: This is a civil trespass and conversion case in which plaintiffs seek monetary damages for the unauthorized subsurface mining of 855,500 tons of limestone. Bromley Quarry & Asphalt, Inc., admits it extracted some rock but disputes the extent of its liability. We must decide: (1) if the statute of limitations began to run because the conversion was reasonably ascertainable by the plaintiffs more than two years prior to the lawsuit's filing; (2) whether the district court properly excluded from evidence certain survey maps argued to be relevant to the damages claim; and (3) whether Bromley Quarry proved it was a good-faith trespasser, allowing it to deduct its operating expenses in calculating the damages award. The lower courts' rulings on these last two questions conflict.

We hold that the lower courts erred by relying on an incomplete summary judgment record to determine when the statute of limitations began running on the plaintiffs' claims. This decision necessarily requires reversing the order restricting the damages computation to a two-year period starting from the lawsuit's filing. And since the statute of limitations period remains in question, the evidentiary ruling regarding the survey maps also needs to be reconsidered on remand with due regard given to the Court of Appeals' analysis as to that ruling.

We affirm the Court of Appeals decision that Bromley Quarry did not prove it was a good-faith trespasser and therefore is liable for $1,733,920 as the enhanced value of the rock it admits taking during the two years immediately preceding the lawsuit. *Armstrong v. Bromley Quarry & Asphalt, Inc.*, No. 109,864, 2015 WL 1310066, at *9 (Kan. App. 2015) (unpublished opinion). The case is remanded for further proceedings.

3

Bromley Quarry operated an underground limestone mine abutting the plaintiffs' property. The main entrance is on company land. The area in controversy is directly east of Bromley Quarry's property and jointly owned by Willis L. Armstrong and Stephanie J. Prohaska (collectively "Armstrong"). A separate tract owned by the Prohaska family lies directly north of Armstrong's property. During the relevant times, Bromley Quarry actively mined the Prohaska family property under a lease agreement. Bromley Quarry once had a lease for the Armstrong property, but it was terminated in 1996 after disputes arose.

In 1992, Armstrong sued, alleging Bromley Quarry was not paying for all the rock mined. In 1996, while the first suit was pending, Armstrong brought an action against Bromley Quarry again, this time for access to the mine to ascertain whether it was encroaching on the Armstrong property. Access was not granted, but the court ordered Bromley Quarry not to trespass or mine the Armstrong property.

The 1992 lawsuit was dismissed with prejudice by agreement in 1999. The stipulation of dismissal recites that Armstrong "cannot prove that any actual damages were caused to them by [Bromley Quarry], based on the 1992 Survey map." It further states Bromley Quarry "agrees and affirms that [it] conducted no mining on [Armstrong's] property, since the time of the prior court orders in this matter in 1992 and further affirms that the map made in 1992 accurately represents the condition and status of the mine on [Armstrong's] property."

Various maps depicting the mine's supposed status over the years figure prominently in this lawsuit. Bromley Quarry had a practice of commissioning surveys detailing its mining activities. Dunn and Stout Surveying created such a map in 1981,

4

which was updated over the years including in 1992. Dunn and Stout's 1992 update is the "1992 Survey map" referenced in the 1999 stipulation.

After 1992, Dunn and Stout no longer performed survey updates, so Bromley Quarry's employees began doing it. From 2000 to 2010, the company filed updated maps with the Kansas Geological Survey and the federal Mine Safety and Health Administration. These maps, last revised in 2009 and 2010, depict the rock now at issue as being in place under Armstrong's property. In other words, the maps prepared by Bromley Quarry showed no mining activity in the area in controversy.

In 2010, Bromley Quarry commissioned an outside firm to create a new map. In approximately March 2011, while their work was still in progress, the surveyors showed Barbara Bromley, Bromley Quarry's sole shareholder, the mine's actual perimeter. She later testified she "knew immediately we were on the Armstrong property" and instructed the mine superintendent to "get off of it immediately and go back north." But she also concealed the trespass from Armstrong when trying to negotiate a mining lease with Stephanie Prohaska that would have covered the area where the trespass and rock removal had already occurred.

In contrast to Bromley Quarry's 2010 map, the completed 2011 survey shows the limestone area now at issue as mined out, *i.e.*, the limestone was gone. This area is directly south of the Prohaska family property and borders an underground haul road known as "the Zero Aisle" because it established the boundary line with the Armstrong property. The Zero Aisle was a path used to get equipment to the mine's face. According to a former Bromley Quarry supervisor, the Zero Aisle was clearly marked. This supervisor, who left his employment in January 2009, testified he instructed drivers during training they were not to go south of the Zero Aisle.

5

But the Zero Aisle was repeatedly relocated as portions of it deteriorated, resulting in further and further encroachment onto the Armstrong property. By late 2009, the Zero Aisle crossed its western border and continued through its middle before turning north. Bromley Quarry stopped all mining around May 2011.

*The district court proceedings*

On May 20, 2011, Armstrong sued Bromley Quarry claiming trespass and conversion of 855,500 tons of limestone. The lawsuit alleged unauthorized mining occurred from February 1996, when the parties' lease terminated, through March 2011.

In response, Bromley Quarry admitted it had recently gone "off course" in its mining activities, trespassed onto the Armstrong property, and removed 173,392 tons of rock in the preceding two years—the limitations period generally applicable to trespass and conversion claims. See K.S.A. 60-513(a)(1), (2). But it denied liability for the remainder, which it referred to as the "disputed rock." Bromley Quarry claimed it did not know when it took this disputed rock but contended it must have been well past the limitations period.

Following discovery, Bromley Quarry moved for summary judgment on Armstrong's claim relating to the disputed rock. It contended this rock was actually taken before 1992, even though that contradicted its earlier stipulation that the 1992 map accurately depicted unmined solid rock in the controverted area, as well as the maps it had prepared and filed with government agencies. Alternatively, Bromley Quarry argued the rock must have been mined before 1996, when it acquired trucks too tall to access the area from which the disputed rock was taken. Either way, the company summarized, the disputed rock claim was outside the applicable two-year statute of limitations because the

6

fact of injury was reasonably ascertainable or the injury occurred beyond the 10-year statute of repose. See K.S.A. 60-513.

The district court granted Bromley Quarry's motion. In doing so, it side-stepped deciding when the disputed rock was actually taken. It simply found any mining was reasonably ascertainable more than two years prior to the filing of suit, so the statute of limitations barred all claims accruing before May 20, 2009. The court further held that Armstrong's evidence at trial "shall be limited based upon the applicable statute of limitations and statute of repose." And from this ruling, the district court decided to exclude from evidence two survey maps Armstrong hoped to use as evidence supporting its damages claim.

Following a bench trial, the district court awarded Armstrong $127,039.60 in damages. This included $10,000 in nominal damages for the haul road's use. The remaining $117,039.60 was for 173,392 tons of limestone that the court found—and Bromley Quarry admits—was converted during the limitations period.

To compute the award for the rock, the district court found the company was a good-faith trespasser. The court said Bromley Quarry did not realize it was mining on the Armstrong property and instead mistakenly or negligently believed the property at issue was on the Prohaska family land, where it was authorized to be. The court limited Armstrong's recovery to a net-profit calculation of $1 per ton, reducing the damages-per-ton by Bromley Quarry's expenses. The court then further decreased the award to account for 10 percent waste in the extraction process and Armstrong's partial ownership interest (75 percent) in the property.

Armstrong appealed, arguing the district court erred by:  (1) limiting the claims based on the two-year statute of limitations; (2) excluding the maps from evidence; and

7

(3) ruling Bromley Quarry was a good-faith trespasser. The Court of Appeals affirmed on the first two issues and reversed on the third.

*The Court of Appeals proceedings*

The panel agreed with the district court that the two-year statute of limitations applied because Bromley Quarry's subsurface trespass and conversion was reasonably ascertainable to Armstrong. See K.S.A. 60-513(b); *Armstrong*, 2015 WL 1310066, at *6. The panel also held the district court erred by excluding the maps from evidence, although it concluded the error was harmless. 2015 WL 1310066, at *4.

As to damages, the panel reversed the determination that Bromley Quarry was a good-faith trespasser. It observed there was no dispute the trespass and conversion occurred or that the company was under a court order not to trespass and mine rock on the Armstrong property. 2015 WL 1310066, at *7. The panel further noted the undisputed evidence about the Zero Aisle showed Bromley Quarry was aware any mining further south was outside the clearly established property line. And it concluded: "[W]hen Bromley Quarry allegedly discovered for the first time that it had trespassed and mined from the Armstrong property, it had no intention of ever telling Armstrong that it had done so, further supporting a lack of good faith." 2015 WL 1310066, at *8. From this, the panel held there was not substantial evidence to support the district court's legal finding that Bromley Quarry was a good-faith trespasser. 2015 WL 1310066, at *9.

The panel held Bromley Quarry owed enhanced value damages for its trespass and unlawful conversion of minerals since it was not a good-faith trespasser. It further held the limestone's enhanced value was $10 per ton, based on undisputed evidence that this was the average retail sales price for quarried rock. And at that price, the removed

8

limestone's total enhanced value jumped to $1,733,920. The panel remanded the case with instructions to enter judgment for the higher damages. 2015 WL 1310066, at *9.

Both sides sought this court's review. Armstrong challenges the panel's statute of limitations analysis and the holding that it was harmless error to exclude the maps from evidence. Bromley Quarry contests the bad-faith trespasser designation and the resulting higher damage award. We granted review. Jurisdiction is proper under K.S.A. 60-2101(b) (review of Court of Appeals decisions).

ANALYSIS

It is helpful to begin by defining the two torts at issue and explaining how they interrelate under the circumstances. Generally, a trespasser is one who enters the premises of another without any right, lawful authority, or express or implied invitation or license. *Gerchberg v. Loney*, 223 Kan. 446, 448, 576 P.2d 593 (1978), *overruled on other grounds by Bowers v. Ottenad*, 240 Kan. 208, 222-23, 729 P.2d 1103 (1986), *abrogated by Jones v. Hansen*, 254 Kan. 499, 509-10, 867 P.2d 303 (1994). Trespass requires an "'intention to enter upon the particular piece of land in question, irrespective of whether the actor knows or should know that he is not entitled to enter.'" *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 730, 915 P.2d 80 (1996).

Conversion is the "unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, 421, 109 P.3d 1241 (2005). Damages are ordinarily the property's value when converted plus interest. *In re Conservatorship of Huerta*, 273 Kan. 97, 111, 41 P.3d 814 (2002).

9

Armstrong's case presents a hybrid of these torts because it involves both trespass for entering onto the land and conversion for removing the limestone located there. As recently explained by the Kentucky Supreme Court in *Harrod Concrete and Stone Co. v. Crutcher*, 458 S.W.3d 290, 294 (Ky. 2015), these "hybrid" claims are treated differently because the conversion claim stems from the trespass:

"Our jurisprudence frames these types of controversies as trespass actions because the gravamen involves subsurface resources that were once in place. Unlike typical trespass cases, however, the damage sustained to the surface may be negligible or non-existent compared to the damage resulting from removal of the natural resources that lay beneath. Once the resources are removed from their native state, they become personal property and are sold at market by the trespasser.

"While the trespass triggers the injury to the landowner, it is the conversion that creates the actual or enhanced value of the extracted resources. Therefore, our precedent seeks to strike a balance between the conversion and trespass measures of damages while incorporating one critical factor—the willfulness of the conduct." 458 S.W.3d at 294.

In recognition of such circumstances, a unique damages rule developed in several jurisdictions, including Kansas. See *Brinkman v. Empire Gas and Fuel Co.*, 120 Kan. 602, 609, 245 P. 107 (1926). If the trespasser acted in good faith, operating expenses are deducted and the mineral rights holder is entitled only to net profit damages. But if the trespasser acted in bad faith, the holder receives enhanced value damages, which means no expenses are deducted. 120 Kan. at 609; *Armstrong*, 2015 WL 1310066, at *6-7; see also *Dexter v. Brake*, 46 Kan. App. 2d 1020, 1040-41, 269 P.3d 846 (2012). The parties do not dispute the rule, only its application to the facts.

To review the lower courts' decisions, we begin by considering Armstrong's challenge to the two-year statute of limitations that both courts found applicable based on the summary judgment record. Next, we address the exclusion of the survey maps.

Finally, we consider Bromley Quarry's disagreement with the panel's holding that it was a bad-faith trespasser, resulting in the enhanced value damages. We affirm the panel, in part, and reverse in part.

*The applicable statute of limitations period*

Trespass and conversion are subject to a two-year statute of limitations. K.S.A. 60-513(a)(1), (2). Generally, the limitations period commences when "the fact of injury becomes reasonably ascertainable to the injured party." K.S.A. 60-513(b). But our law also contains a statute of repose, which provides that despite any tolling of the limitations period, no action may be commenced "more than 10 years beyond the time of the act giving rise to the cause of action." K.S.A. 60-513(b).

Armstrong filed this lawsuit on May 20, 2011, so the best-case scenario in light of the statute of repose would be to recover damages for rock removed since May 2001. On the other hand, Armstrong's worst-case scenario is the one determined by both lower courts, *i.e.*, that the claim had already accrued because the fact of injury was reasonably ascertainable to the injured party more than two years before filing suit. This limits recovery to just the value of the rock removed after May 20, 2009. *Armstrong*, 2015 WL 1310066, at *5-6.

Armstrong argues the fact of injury was not reasonably ascertainable or, alternatively, that the limitations period tolled because Bromley Quarry engaged in a continuous trespass. Since the district court resolved the limitations issue on summary judgment, we view the issue from a procedural perspective. Our standard of review is well known:

11

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]'" *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1204, 308 P.3d 1238 (2013).

## 1. *The limited undisputed material facts from the record*

Even though the district court determined the injury was reasonably ascertainable to Armstrong, it did not decide when the disputed rock was actually mined. In its summary judgment order, the district court instead simply stated:

"Plaintiffs testified that they were suspicious that they were not being properly compensated throughout the years for the rock that belonged to them. Plaintiffs suspected that the defendants were removing rock from their property after 1996. Plaintiffs even suspected that the survey maps were not correct.

"Plaintiffs testified as to these suspicions but yet settled two law suits covering a portion of the time that is currently in dispute. The plaintiffs claim that they have lost rock from February 19, 1996 to March 26, 2011. The plaintiffs settled a lawsuit, 92C91, by filing a journal entry of dismissal with prejudice in 1999 and acknowledged in the dismissal that they were not entitled to any more compensation for rock from the current defendants."

The district court went on to find Armstrong had "reasonable suspicions" that Bromley Quarry was mining limestone "as far back as 1987" and that these suspicions "continued through 2006 to 2008." Both Willis Armstrong and Stephanie Prohaska admitted hearing and feeling blasting on or near the property within three to five years before filing this lawsuit. The district court further found Armstrong "had the ability to have their property inspected but again for whatever reason chose not to cause this to occur." The district court did not elaborate on what that "ability" was.

Bromley Quarry argued in its motion that Armstrong could have confirmed any suspicions of unauthorized subsurface mining by: (1) exercising legal rights, under K.A.R. 47-15-8 or K.S.A. 49-101 *et seq.*, that Bromley Quarry claimed allowed a property owner under certain circumstances to seek an inspection or survey of the owner's mine; (2) reviewing maps on file with the Kansas Geological Survey; (3) physically inspecting the mine; and (4) filing suit to gain access to the mine. For its part, the panel analyzed the record and those arguments in the following manner:

> "In Willis Armstrong's deposition, as well as later at trial, he admitted that he was suspicious for years that Bromley Quarry was mining on his property. He also testified that he, his sister, and Stephanie Prohaska could feel blasting on the property within the 3 to 5 years before filing the lawsuit. The explosions were so violent that dishes would shake off of the wall. Armstrong did obtain maps of the mine from the Kansas Geological Survey, which showed that there had been no mining on the Armstrong property. However, he never attempted to get his own survey or inspection of his property, he never had cores drilled, and did not ask any government agency for help during the time when his suspicions arose, although he did consider it.

> "Given Armstrong's undisputed strong suspicion that Bromley Quarry was mining the Armstrong property, as soon as Armstrong or Prohaska heard blasting on the property, they could have filed a trespass claim. Moreover, the trespass was reasonably ascertainable had Armstrong or Prohaska conducted a survey of the Armstrong property.

13

Because the standard is objective rather than subjective, it does not matter what Armstrong actually did to investigate; it is whether the trespass was reasonably ascertainable. In this case, the trespass was reasonably ascertainable through at least one avenue." *Armstrong*, 2015 WL 1310066, at *5-6.

But a closer look at the summary judgment record is not as definitive or as complete as the district court and panel viewed it.

It is clear the district court zeroed in on the following factual allegations from Bromley Quarry's summary judgment motion:

"8. Plaintiffs were always suspicious they were not being properly compensated by Bromley Quarry for rock removed from their property.

"9. Plaintiffs always suspected that Bromley Quarry was removing rock from their property after the earlier lawsuit was dismissed.

"10. Plaintiffs could hear and feel blasting on their property in the 3 to 5 years prior to filing this lawsuit.

"11. Willis Armstrong's sister consistently complained of feeling blasting on the property while she lived on the property, with those complaints diminishing in the last 3 years.

"12. Plaintiffs always suspected the earlier survey map created by Dunn & Stout did not accurately portray the condition of the mine when Case No. 91-C-91 was dismissed in 1999.

"13. Plaintiffs had frequent contact with state regulators concerning the condition of the Bromley Mine and reviewed numerous maps on file with the Kansas Geological Survey.

"14. Plaintiffs never sought an inspection by state regulators of the Bromley Mine pursuant to K.A.R. 47-15-8.

14

"15. In the last 10 years, Plaintiffs did not pursue a survey through submission of an affidavit to this Court pursuant to K.S.A. 49-106."

Armstrong controverted paragraphs 8, 9, and 12, each of which relied on Willis Armstrong's deposition testimony. And that testimony does not square with what Bromley Quarry asserted on summary judgment. In paragraph 8, Willis did not say he and Stephanie Prohaska were "always suspicious they were not being properly compensated by Bromley Quarry for rock removed from their property." Rather, he simply agreed with a question that they were "interested for years and suspicious that there was mining activity going on on your property, correct?" And that same response was also claimed by Bromley Quarry to support its assertion in paragraph 9 that plaintiffs "always suspected" the company was removing rock after the lawsuit was dismissed in 1999. Paragraph 12 was controverted to the extent it referenced the Dunn and Stout survey because the cited testimony did not refer to that firm.

What also scrambles the summary judgment record was Armstrong's response in opposition to the motion because Armstrong added factual allegations creating disputed material facts. See Kansas Supreme Court Rule 141(b) (2015 Kan. Ct. R. Annot. 242) (permitting the party opposing summary judgment to state additional genuine issues of material fact). Bromley Quarry did not reply or explain why these additional facts alleged by Armstrong did not create disputed material facts. See Supreme Court Rule 141(c) (permitting a reply).

In paragraphs 4, 5, 9, and 10 of Armstrong's opposing statement of facts, Armstrong noted they had sought an injunction to gain access to the mine in 1996 and that the requested relief was denied. This seemingly put in controversy whether Armstrong could have discovered Bromley Quarry's tortious conduct by pursuing another

lawsuit when the previous litigation had been unsuccessful. Neither lower court addressed this. Armstrong further explained that Willis and Stephanie had obtained copies of the mine maps filed with government agencies, which showed no mining activity on the Armstrong land on every map filed through 2010. Again, neither lower court addressed how these inaccurate or deceptive maps impacted their analyses.

Looking within the 10-year timeframe set by the statute of repose in K.S.A. 60-513(b), the summary judgment record produced by both sides gives us narrow undisputed material facts bearing on Armstrong's ability to discover the unauthorized mining during the relevant time. We list these as: (1) Armstrong's admitted suspicions of unauthorized mining based on the previous business dealings with Bromley Quarry; (2) Armstrong's house shaking from blasting somewhere on the property; (3) a prior court order—still in effect—requiring Bromley Quarry to stay off the Armstrong property; (4) Armstrong's failure to take additional legal action; and (5) the availability and review of maps filed with regulatory agencies showing no mining.

Based on this limited record, the question is whether Bromley Quarry was entitled to judgment as a matter of law that any claim for rock taken before May 20, 2009, was barred by the two-year statute of limitations because the injury was reasonably ascertainable to Armstrong. We consider this issue next and conclude summary judgment was inappropriate.

2. *When the statute of limitations began to run*

We review de novo the trial court's conclusions of law on the summary judgment motion based on the undisputed facts set out above. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). In addition, we must interpret K.S.A. 60-513, which presents a

16

question of law also subject to de novo review. *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 630, 355 P.3d 667 (2015).

K.S.A. 60-513(b) governs the statute of limitations for trespass and conversion claims. It states:

> "(b) Except as provided in subsections (c) and (d), *the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act*, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." (Emphasis added.) K.S.A. 60-513.

"Inherent in [the phrase] 'to ascertain' is 'to investigate.'" *Davidson v. Denning*, 259 Kan. 659, 675, 914 P.2d 936 (1996). In *Davidson*, a wrongful death case, the court wrote that the "fact of death should be a 'starting point for inquiry'" and at that point "[t]he wrongful death plaintiff is charged with constructive knowledge of information that is available through a reasonable investigation of sources that contain the facts of the death and its wrongful causation." 259 Kan. at 678.

Because the mining occurred below ground level, Bromley Quarry's intrusion upon the Armstrong property and theft of the rock would not have been immediately apparent to Armstrong, without more. And under these facts, that something more must have been the house shaking that Armstrong discerned to be from blasting somewhere on the property and the suspicions of unauthorized mining based on previous business dealings with Bromley Quarry.

17

Drawing from *Davidson*'s lessons, we view these circumstances as "a 'starting point for inquiry,'" *i.e.*, they triggered an obligation to investigate if Bromley Quarry was trespassing onto the property and mining rock. See *Davidson*, 259 Kan. at 678. But what, if anything, could Armstrong have done next to ascertain the fact of this injury?

As already mentioned, it is undisputed Willis obtained maps from the regulatory agencies, some of which Bromley Quarry had prepared. Without exception, those maps incorrectly showed there had been no mining on the Armstrong property. The panel noted that after inspecting these maps, Willis did not try to get "his own survey or inspection of his property, he never had cores drilled, and did not ask any government agency for help during the time when his suspicions arose, although he did consider it." *Armstrong*, 2015 WL 1310066, at *5. But what would cause a reasonably prudent landowner to take this additional action under the circumstances—after reviewing maps on file with regulatory agencies that showed no mining had occurred on his or her property? The limited record here does not explain that, and neither the panel nor the district court delved further into this to consider how that might impact the statute of limitations analysis. And the panel arrived at its conclusion even though there is nothing in the record that informs whether such activities would have been possible, practical, or effective.

In other words, we cannot determine from this narrow record whether pursuing these avenues of investigation would have been "reasonable," nor whether these avenues "contained the facts" of Bromley Quarry's wrongful conduct, *i.e.*, would have revealed the trespass and conversion. *Cf. Davidson*, 259 Kan. at 675-76 (fact of injury was reasonably ascertainable under the circumstances given wrongful death plaintiff's suspicions and fact that law firm with whom she consulted "quickly assessed [the claim] from the . . . records" available on the date of decedent's death).

18

This leads us to consider the regulatory and statutory avenues that Bromley Quarry argues would have allowed property owners to have a mine surveyed. Neither the panel nor the district court specifically referred to any regulations or statutes when addressing this argument, nor did either develop any analysis relevant to the issue. Bromley Quarry cited K.A.R. 47-15-8 and K.S.A. 49-106 for the proposition that Armstrong had regulatory and statutory avenues available to ascertain the trespass and conversion. The administrative regulation, K.A.R. 47-15-8, provides:

"(a) Any person may request a state inspection under K.A.R. 47-15-7(b) by furnishing the secretary or secretary's designee with a signed, written statement or an oral report followed by a signed, written statement. The statement shall include the following:

(1) the reasons that the person believes a violation, condition, or practice referred to in K.A.R. 47-15-7(b) exists; and

(2) a phone number and address at which the person can be contacted.

"(b) Upon request by the person, the identity of any person supplying information to the secretary or secretary's designee relating to a possible violation or imminent danger or harm shall remain confidential, unless that person accompanies the inspector on the inspection.

"(c) If a state inspection is conducted as a result of information provided to the secretary or secretary's designee as described in subsection (a) of this regulation, the person requesting the inspection shall be notified as far in advance as practicable as to when the inspection will occur. The person may accompany the secretary or secretary's designee. During the inspection, the person shall have a right of entry to, upon, and through the coal exploration or surface coal mining and reclamation operation about which that person supplied information. However, the person shall be in the presence of and under the control, direction, and supervision of the secretary or secretary's designee while on the mine property. This right of entry shall not include a right to enter buildings without consent of the person in control of the building or without a search warrant.

19

"(d) Within 10 days after the state inspection or, if there is no inspection, within 15 days after receipt of the person's written statement, the secretary or secretary's designee shall send the person the following:

(1)(A) If an inspection was conducted, a description of the enforcement action taken. This description may consist of copies of the state inspection report and of all notices of violation and cessation orders issued as a result of the inspection or an explanation as to why no enforcement action was taken; or

(B) if no state inspection was conducted, an explanation of the reason why an inspection was not considered to be necessary; and

(2) an explanation of the person's right, if any, to informal review of the action or inaction of the secretary or secretary's designee under K.A.R. 47-15-1a(a)(6).

"(e) Copies of all materials in paragraphs (d)(1) and (d)(2) of this regulation shall be given by the secretary or secretary's designee to the person alleged to be in violation within the time limits specified in those paragraphs. However, the name of the person requesting the inspection shall be removed unless disclosure of the person's identity is permitted under subsection (b) of this regulation."

In its summary judgment motion, Bromley Quarry made only conclusory statements that Armstrong "could have requested an inspection of their property and the Bromley Mine through petitioning the Secretary of the Kansas Department of Health and Environment." It cited K.A.R. 47-15-8(a) ("Any person may request a state inspection under K.A.R. 47-15-7(b) by furnishing the secretary or secretary's designee with a signed, written statement or an oral report followed by a signed, written statement."). Bromley Quarry went on to assert that if the agency refused to conduct the inspection, Armstrong could have pursued judicial review under K.A.R. 47-15-1a(a)(6).

20

The above regulations were promulgated under authority from the state's Mined-Land Conservation and Reclamation Act, K.S.A. 49-401 *et seq*. Bromley Quarry made no assertion related to these regulations; we have located no caselaw suggesting that these regulations operate in a manner relevant to Armstrong's ability to investigate the fact of injury; and none have been cited to us. The Act itself declares public policy regarding reclamation efforts required after surface mining operations. See K.S.A. 49-402.

We hold the summary judgment record fails to support a conclusion that these regulations would have made the trespass and conversion reasonably ascertainable to Armstrong.

As to the statutes, Bromley Quarry's summary judgment motion similarly quoted K.S.A. 49-106 and then asserted without other authority that "[h]ad Plaintiffs sought an inspection through submission of an affidavit to this court, Plaintiffs could have pursued a temporary injunction pursuant to K.S.A. 49-103."

K.S.A. 49-106 provides:

"When any owner, tenant or subtenant of a lot or lots or tract of land shall file in any court of competent jurisdiction within the county in which said lot or lots or tract of land may be situated, his or her affidavit, or the affidavit of any other creditable person for them, stating that from knowledge, information or belief the party or parties owning, controlling or working the adjoining lot or lots or tract of land, and upon which said party or parties are sinking shafts, mining, excavating and running drifts, and that said drifts, in which said parties are digging, mining and excavating any mineral ore or veins of coal, extend beyond the lines and boundaries of said lot or lots or tract of land owned, controlled or worked by them, and have entered into and upon the premises of the party or parties making said affidavit, or for whom said affidavit is made, the judge of such court shall issue his or her written order, and deliver or cause the same to be delivered to the county surveyor or the surveyor's deputy, commanding him or her to proceed without

delay to survey said drift, by entering any and all shafts upon said lot or lots or tracts of land that the surveyor may see fit, for the purpose of ascertaining the course and distance of said drift or drifts, and to locate the same upon the surface."

As with the regulations, Bromley Quarry fails to develop its argument that the statute gave Armstrong a meaningful mechanism to discover the injuries so that the statute of limitations period began running.

We note an additional statute, K.S.A. 49-101, which also has no caselaw development. It provides:

> "Whenever an affidavit properly verified by the person aggrieved, or his or her agent or attorney, shall be presented to the district court of the proper county during termtime, or to the judge thereof in vacation, in which it shall be made to appear that such person shall have good reason to believe that any other person or persons, corporation or corporations, are without authority encroaching upon the land of the person aggrieved, whether the same be held by lease or otherwise, and are mining or taking coal, rock or limestone therefrom, it shall be the duty of the said court or judge to order and direct the county surveyor to survey the mine or mines of the person or persons, corporation or corporations accused thereof, for the purpose of ascertaining the truth thereof; the party applying for such survey to first give bond in such sum as may be deemed sufficient by said court or judge, and the same to be at the time approved by said court or judge, conditioned for the payment of the payment of the costs of said survey." K.S.A. 49-101.

While these statutes may be relevant to the issue at hand, the record and the lower courts' analysis are undeveloped regarding their application, conditions precedent, or likely effectiveness in making the fact of injury reasonably ascertainable to Armstrong. Accordingly, they cannot serve as the basis for summary judgment without more.

We hold the district court erred in granting summary judgment on the statute of limitations issue based on the record before it. The undisputed material facts were inadequate to conclude as a matter of law that any mining was reasonably ascertainable. The Court of Appeals erred by affirming the district court. The case must be remanded for further proceedings regarding the applicable statute of limitations.

*Tolling based on a continuing trespass theory*

Armstrong also argues Bromley Quarry's wrongful conduct was part of a continuing trespass. Armstrong asserts this as an alternative basis for reversing the district court's and panel's decisions on the statute of limitations question. See *Sullivan v. Davis*, 29 Kan. 28, 34, 1882 WL 967 (1882) (continuing trespass prevents statute of limitations from running until trespass complete); *Dexter v. Brake*, 46 Kan. App. 2d 1020, 1029, 269 P.3d 846 (2012) (statute of limitations does not begin to run for continuing trespass until trespass is complete).

But the district court record causes us to doubt whether Armstrong properly raised this issue to the district court thereby preserving it for appellate review. And given our decision to reverse and remand on the statute of limitations issue, we need not resolve this. The district court can address whether Armstrong previously raised this issue in its responsive pleadings, if presented, on remand.

*Exclusion of the survey maps*

Armstrong seeks review of the panel's decision that it was harmless error for the district court to exclude from evidence two survey maps. Some further background is needed.

23

The district court excluded Plaintiffs' Proposed Exhibits 6 and 7. Both are maps produced by Raymond Bretton of Alpha Land Surveys in 2012. To create Proposed Exhibit 6, Alpha took the 1992 map created by Dunn and Stout and overlaid the 2011 Alpha map to establish the mine's perimeter as it was in 1992. This was necessary because the earlier map was not drawn to the same scale as the later map. Proposed Exhibit 7 contains a calculation of the disputed rock area, in square feet, which Armstrong's expert later used to calculate the tonnage of limestone removed.

As discussed, the 1992 Dunn and Stout map was updated over the years by Bromley Quarry employees. As the panel correctly explained:

"At the bench trial, Bromley Quarry objected to the admission of Bretton's updated map of the mine and his volume and area calculation maps. Its objection was for lack of relevance and foundation. The district court agreed; sustaining the objection because the underlying 1992 map was created outside the statute of limitations and for the lack of foundation.

"Whether Bretton relied on the 1992 map or the updated 2009 map to establish the perimeter of the mine on the Armstrong property is not important. It is clear, from the 2009 map that the perimeter of the mine on the Armstrong property had not changed since 1992. In other words, according to Bromley Quarry's own maps, the perimeter of the mine on the Armstrong property remained the same from 1992 to 2009. It was not until the survey map conducted by Alpha Land Surveys, Inc., in 2011 that it was revealed the perimeter of the mine on the Armstrong property had substantially changed. This would suggest, as circumstantial evidence, that Bromley Quarry had in fact removed more rock than stipulated to from the Armstrong property between 2009 and 2011." *Armstrong*, 2015 WL 1310066, at *3.

Based on that analysis, the panel held the district court erred in excluding these exhibits as irrelevant. The panel held the maps were material because they "supported the

disputed fact that Bromley Quarry removed more rock from the Armstrong property between 2009 and 2011" and probative since they had some logical tendency to prove that Bromley Quarry mined more rock during the statute of limitations period. 2015 WL 1310066, at *4. The panel further held the proper foundation was laid. But the panel held the error was harmless because "there was substantial competent evidence to support the district court's ultimate conclusion that only 173,392 tons of rock was removed during the given time frame." 2015 WL 1310066, at *4.

Bromley Quarry did not petition for review of the panel's determination that the exhibits were improperly excluded. But Armstrong asks us to reconsider the panel's finding that the trial court's error was harmless if their arguments result in a lengthening of the period of recovery.

Armstrong presents no argument as to whether the maps' exclusion was harmless as to the district court's finding that Bromley Quarry converted 173,392 tons of rock during the two years preceding the lawsuit, and the panel's error and harmlessness analyses focused solely on the impact of the evidentiary ruling on that finding. Accordingly, because Armstrong does not challenge the panel's analysis on this point, and because the district court has not yet addressed the admissibility of these maps as they relate to other time periods for which Armstrong may be able to recover damages, it is sufficient for our purposes to observe that their admission needs to be considered in light of what will happen on remand.

*Bromley Quarry's designation as a good-faith trespasser*

When calculating damages for a trespass, the general rule is that a plaintiff can recover for any loss sustained. *Mackey v. Board of County Commissioners*, 185 Kan. 139, 147, 341 P.2d 1050 (1959) (in trespass action, "wrongdoer should compensate for all the injury naturally and fairly resulting from [the] wrong"). For conversion of personal

property, the general rule allows "'the value of the property at the time of the conversion, with interest thereon to the date of the verdict.'" *In re Conservatorship of Huerta*, 273 Kan. 97, 111, 41 P.3d 814 (2002); *Hefley v. Baker*, 19 Kan. 9, 1877 WL 955 (1877).

But in line with caselaw from other jurisdictions, Kansas adopted a different damages rule for what are characterized as hybrid trespass/conversion claims involving the production of mineral interests. Two Kansas Supreme Court cases are relevant: *Brinkman v. Empire Gas and Fuel Co.*, 120 Kan. 602, 245 P. 107 (1926), and *Dailey v. Joslin*, 172 Kan. 199, 240 P.2d 471 (1952). And although *Brinkman* is this court's sole case on the issue, *Dailey* is close enough to warrant mentioning.

In *Brinkman*, a property owner executed an oil and gas lease with plaintiff, while the defendant obtained a second, conflicting, oil and gas lease after misrepresenting to the property owner that the first lease was released. When the defendant entered and began producing and converting large quantities of oil, plaintiff sued for trespass. The issue was whether the first lease was still valid. The court held it was and that plaintiff's injury could be redressed by damages even though plaintiff, as a lessee, had no title to the oil defendant converted. In remanding the case to the district court, the court suggested that an atypical damages rule might apply, depending on whether the trespass was willful or in good faith. 120 Kan. at 608-10. It explained:

> "A willful trespasser should probably pay the value at the surface of the oil converted. The [*Backer*] case cited indicates that cost of production might be allowed to one who entered in good faith under a lease believed to be valid. It is not necessary to determine these questions now. Plaintiff is entitled in any event to an accounting for the oil removed from the premises and its valuation at the market price." *Brinkman*, 120 Kan. at 609 (discussing *Backer v. Penn Lubricating Co.*, 162 F. 627 [6th Cir. 1908]).

26

*Dailey* involved another dispute over whether an oil and gas lease remained in effect. The plaintiff-lessee sued the defendants-lessors to quiet title to the lease after both parties drilled wells on the property. The court held the lease was valid, effectively giving plaintiff the right of possession and making the defendants trespassers when they drilled and operated their own wells. But in figuring damages, the court permitted the defendant to deduct drilling and operating expenses, stating:

> "[T]he plaintiff learned that [defendant] was starting to drill or drilling on this land under the claim that the lease itself had expired. He could have brought this suit promptly instead of waiting until two days before six months after the decree in the action quieting title. We think [defendant] is entitled to reimbursement for those expenses in the amount found by the court." 172 Kan. at 211.

*Brinkman* is not mentioned in *Dailey*, and it is different because *Dailey* flips the rule by examining plaintiff's actions and concluding plaintiff did not act promptly. In light of this, *Dailey* smacks more strongly of equitable estoppel, and the result was that plaintiff was awarded only net profit damages. But it is similar to the extent that it involved a hybrid trespass/conversion claim and the damages were reduced by the operating expenses.

Kansas appellate courts were not confronted with this question again until *Dexter*. Notably, the *Dexter* panel did not cite *Brinkman*, but it adopted the same good-faith/bad-faith distinction for the character of the trespass while fleshing out the rule's contours. The *Armstrong* panel relied exclusively on *Dexter* to define the law.

In *Dexter*, the lessors of an oil and gas lease (Dexter) sued the lessee (Brake) for trespass and conversion. The lease was deemed canceled in prior litigation as to all but one mineral interest owner, and Brake continued operating believing this was required to fulfill his obligation to the outstanding interest owner. The court concluded that Brake

27

was a trespasser and for the purposes of damages held that the "issue is whether Brake was a good-faith trespasser or a bad-faith trespasser." *Dexter v. Drake*, 46 Kan. App. 2d 1020, 1040, 269 P.3d 846 (2012). It developed this distinction:

> "A good-faith trespasser is an individual who has an honest and reasonable belief in the superiority of his or her title. 1 Williams & Meyers, Oil and Gas Law § 226.3 (2010). Because the minerals are still owned by the mineral interest owner, if a producer lawfully extracts the minerals and delivers them to the mineral owner, justice requires the mineral owner to reimburse the producer for a proportionate share of the expenses of extraction; otherwise the mineral owner would be unjustly enriched at the producer's expense. *Krug*, 5 Kan. App. 2d at 429. So a good-faith trespasser is allowed to offset the costs of drilling and operating the wells against the proceeds of the sale of the oil and gas. Hemingway Oil and Gas Law and Taxation § 4.2, p. 153 (4th ed. 2004). These are referred to as net profit damages. [Citations omitted.]" 46 Kan. App. 2d at 1040-41.

The *Dexter* panel then put forth this definition of a bad-faith trespasser:

> "A bad-faith trespasser is a converter of the oil and gas produced. A simplistic way of viewing the distinction is to say that a good-faith trespasser reasonably believes he or she is right, while a bad-faith trespasser knows he or she is wrong. [Citation omitted.] Bad-faith trespassers are held strictly accountable for their misappropriation of another's property and are liable to the rightful owner for the entire enhanced value of the oil and gas produced at the surface. In other words, the bad-faith trespasser is not allowed to offset the costs of drilling and operating the wells against the proceeds from the sale of the oil and gas. 1 Williams & Meyers, Oil and Gas Law § 226.1 (2010). These are referred to as enhanced value damages." 46 Kan. App. 2d at 1041.

The *Dexter* panel was the first Kansas appellate court to determine whether a trespass was committed in good or bad faith. In holding Brake was a good-faith trespasser, it adopted what appears to be a mixed subjective and objective analysis,

stating: "We find that Brake was a good-faith trespasser because he had an honest and reasonable belief in the superiority of his title." 46 Kan. App. 2d at 1043.

The panel noted Brake had a valid lease in effect at the time of the prior lawsuit and that the controversy swirled around whether the entirety clause remained applicable after the oil and gas lease was cancelled as to some but not all of the lessors. Based on those facts, the panel reasoned Brake relied in good faith on his belief that he had a continuing responsibility to the remaining mineral interest owner. And it further observed that Brake continued to pay royalties to the other former lessors, suggesting an "'honest intention to abstain from taking any unconscientious advantage of another.'" 46 Kan. App. 2d at 1043 (quoting *Sapulpa Petroleum Co. v. McCray*, 136 Okla. 269, 270, 277 P. 589 [1929]).

The Court of Appeals in the present case reached a different result. The panel rejected Bromley Quarry's good-faith assertion that it did not realize it had progressed onto Armstrong's property. Using a reasonableness inquiry to evaluate that contention, and putting the burden of proof squarely on Bromley Quarry, the panel concluded that, regardless of actual knowledge, Bromley Quarry "reasonably should have known" it was on Armstrong's land. *Armstrong*, 2015 WL 1310066, at *7-8. And in rejecting the district court's conclusion that Bromley Quarry acted in good faith because it believed it was extracting rock from property it was legally working and believed in the superiority of its right and title to mine the property, the panel noted Bromley Quarry had been ordered by a court in 1996 not to trespass on the Armstrong property, which the panel held unquestionably showed Bromley Quarry lacked a legal right to be on Armstrong's property. 2015 WL 1310066, at *7.

The panel then focused on whether it was objectively reasonable for Bromley Quarry to be unaware it was mining on the Armstrong land, stating:

"In addition, once Bromley Quarry established the Zero Aisle, it was well aware that any mining south of the Zero Aisle would be outside the established property line. The Zero Aisle was clearly marked. Drivers were told, at least up to 2006, not to go south of the Zero Aisle. In 2009–2010, the haul road was relocated south of the Zero Aisle. It is unreasonable to believe that Bromley Quarry was unaware it was mining south of the Zero Aisle, which it knew to be on the Armstrong property. This was a savvy business enterprise that was required to map its progress and report it annually to the Kansas Geological Survey. In addition, if the disputed area of property was mined prior to 2009, as Bromley Quarry argues, certainly it would have realized it was on Armstrong property when, prior to 2009, its excavation activity reached the existing Armstrong mine. Bromley Quarry also clearly knew that the new haul road was located on Armstrong property, significantly south of the Zero Aisle. Bromley Quarry argues, in support of the district court's statute of limitations finding, that '[h]ad Plaintiffs bothered to inspect the property years ago, it would have been obvious that rock was missing from their property.' It is logical to conclude that if Plaintiffs should have known, the professional corporation responsible for mining the land and mapping its progress reasonably should have known." 2015 WL 1310066, at *8.

Finally, the panel disagreed with the argument that Barbara Bromley's post-survey conduct of seeking a lease agreement established Bromley Quarry was a good-faith trespasser, because she testified at trial that she had no intention of telling Armstrong what had happened. 2015 WL 1310066, at *8. In the end, the panel held there was not substantial competent evidence to support the district court's finding that Bromley Quarry was a good-faith trespasser. 2015 WL 1310066, at *9. On review, Bromley Quarry argues the panel exceeded its authority by weighing conflicting evidence and disregarding the trial court's credibility assessment of witnesses concerning the company's intent when trespassing.

*1. Standard of review*

We agree with the panel that deciding whether a trespasser receives the status of a good-faith trespasser is a mixed question of fact and law. See 2015 WL 1310066, at *6 (citing *Dexter*, 46 Kan. App. 2d at 1040). We therefore review the district court's factual findings under the substantial competent evidence standard with its conclusions of law based on those facts subject to unlimited review. *Progressive Products, Inc. v. Swartz*, 292 Kan. 947, 955, 258 P.3d 969 (2011).

*2. Analysis*

We begin with the burden of proof. The district court did not expressly state which party carried the burden of proving the nature of Bromley Quarry's trespass, but the panel did. It held the burden is on the trespasser to show that the trespass was done in good faith, citing 1 Williams & Meyers, Oil and Gas Law, § 226.3, p. 394.17 (2014), and quoting Anderson, Dzienkowski, Lowe, Peroni, Pierce & Smith, Hemingway Oil and Gas Law and Taxation § 4.2, p. 157 (4th ed. 2004) ("To satisfy the good faith test the person must not only have actually held the belief, but there must be adequate support for the belief. A person may not keep himself ignorant and then claim to be in good faith; the reliance must be reasonable."). *Armstrong*, 2015 WL 1310066, at *7. On review, Bromley Quarry does not dispute the panel's imposition of the burden of proof on it, and we agree the trespasser carries this burden.

To meet that burden to prove its character as a good-faith trespasser, what was Bromley Quarry required to show? The answer must be that it had "an honest and reasonable belief in the superiority of [its] title" to the property in question. *Dexter*, 46 Kan. App. 2d at 1040; *Armstrong*, 2015 WL 1310066, at *6. In other words, can Bromley Quarry honestly and reasonably assert its legal right to be on Armstrong's property and

31

mine the limestone there? If not, there is no basis to assert that the trespass was done in good faith. The district court erred when it focused on excuses for Bromley Quarry's admitted trespass that were not focused on whether the company honestly and reasonably believed it had a legal right to be where it was.

The Kansas cases discussed above illustrate this point well. In *Brinkman*, there were two competing oil and gas leases in which a legal question was asserted whether the first lease in time was still valid. *Brinkman*, 120 Kan. at 609. In *Dailey*, the dispute was whether the plaintiff's lease was lawful under its own terms and the terms of a collateral agreement between the parties when the lessor-defendants drilled and operated their own wells. *Dailey*, 172 Kan. at 211. The dispute in *Dexter* similarly focused on whether the trespasser could honestly and reasonably claim a legal right to operate on plaintiffs' property under a lease's entirety clause. *Dexter*, 46 Kan. App. 2d at 1043.

But with Bromley Quarry's assertion of good faith, the district court focused on the company's subjective intent. The district court ruled:  "The Defendant, Bromley Quarry & Asphalt, Inc.[,] believed in the superiority of their right and title to be on the property, but only through negligence or an innocent mistake they ended up on the property of the Plaintiffs." In so ruling, the district court relied on the following facts:  (1) employees had been instructed not to go south of the property line and mine Armstrong's property; (2) Bromley Quarry established the Zero Aisle as the border to the Armstrong property "[i]n an effort to prevent mining activity"; (3) company officials always believed the haul road was located on company property; (4) company officials believed their employees could travel across Armstrong's property "because it was their responsibility to maintain the property and federal regulators approved relocating the haul road on the Armstrong property"; (5) Bromley Quarry commissioned the final Alpha Land survey; (6) Barbara Bromley instructed employees to get off of Armstrong's property when the survey results

32

were shown to her; and (7) Barbara Bromley attempted to negotiate a lease to cover the mined area, even though she did not tell Armstrong about the trespass.

In reversing the district court, the panel rejected this evidence as a basis to support the district court's good-faith finding. *Armstrong*, 2015 WL 1310066, at *7-8. But much of its discussion was unnecessary because the emphasis only needed to be on whether Bromley Quarry had an honest and reasonable belief that it had a legal right to be on Armstrong's property and mine the limestone—a claim the panel rejected, as already discussed, based on the outcome of the 1996 litigation.

The only colorable basis for finding Bromley Quarry held such a belief among the evidence cited by the district court lies with the assertion regarding Bromley Quarry's duty to maintain the property and federal regulators' supposed approval of relocating the haul road onto Armstrong property. But even assuming this motivated Bromley Quarry to reasonably enter onto Armstrong's property, these assertions do not show Bromley Quarry possessed an honest and reasonable belief in its legal authority to mine the Armstrong property. Likewise, the argument was not developed beyond a mere assertion that company officials believed these things to be true. *Cf. Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 191, 106 P.3d 483 (2005) ("'Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority or in the face of contrary authority, is akin to failing to brief an issue. Where the appellant fails to brief an issue, that issue is waived or abandoned.'").

Simply put, Bromley Quarry failed to put forth evidence supporting even an argument that it honestly believed it had superior legal title to the Armstrong property and the legal right to mine there. Accordingly, the Court of Appeals correctly held the district court erred in concluding the company was a good-faith trespasser. For that

reason, we affirm the panel's holding that Armstrong was entitled to enhanced value damages.

To sum up, we affirm in part, reverse in part, and remand to the district court with instructions to award damages to Willis Armstrong and Stephanie Prohaska based upon their ownership interest in the land as determined by the panel and for further proceedings as to the remainder of Armstrong's claims consistent with this opinion.