NOT DESIGNATED FOR PUBLICATION

No. 123,360

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SACRED LEAF, LLC, and TREVOR BURDETT,
*Appellants*,

v.

CYRUS RIAHI,
*Appellee*.


MEMORANDUM OPINION

Appeal from Johnson District Court; ROBERT J. WONNELL, judge. Opinion filed January 14, 2022. Affirmed.

*Matthew J. Donnelly*, of Petefish, Immel, Hird, Johnson, Leibold & Sloan, LLP, of Lawrence, for appellants.

*Eric C. Carter*, of Olathe, for appellee.


Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.


PER CURIAM:  Trevor Burdett and Cyrus Riahi were co-owners of Sacred Leaf, LLC, when they had a falling out. The falling out led to a lawsuit between Burdett and Riahi. Burdett and Riahi entered into a settlement agreement which led to the dismissal of the suit. As part of the settlement agreement, Burdett agreed to purchase Riahi's interest in Sacred Leaf and in return Riahi would deliver a canopy and three signs to Burdett in set intervals set out in the contract. According to the agreement, Riahi was supposed to deliver the first sign three months after the execution of the settlement agreement. Riahi failed to do so, and Burdett filed suit against Riahi.

The district court ruled that Riahi did not materially breach the settlement agreement by his failure to deliver the first sign within three months of the execution of the settlement agreement. As a result, the court ruled that Riahi was the prevailing party in the action and awarded him attorney fees. Burdett raises four main issues on appeal. On all issues we hold in Riahi's favor. And thus, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On March 26, 2019, Burdett and Sacred Leaf, LLC, and Riahi entered into a settlement agreement and release. Burdett and Riahi were members of Sacred Leaf when a dispute arose between the two on the use of intellectual property related to Sacred Leaf. Burdett sued Riahi as a result of the dispute. The settlement agreement sought to settle the lawsuit and any related disputes and discrepancies between Burdett and Riahi.

As part of the settlement agreement, Riahi agreed to assign to Burdett his interest in a trademark application, his membership interest in Sacred Leaf, LLC, and his interest in brand or trade identifications used by Sacred Leaf and Burdett. Riahi also agreed to assign to Burdett:

> "Three Sacred Leaf signs . . . and one canopy. The canopy will be delivered to Burdett upon execution of this agreement, one light-up sign will be delivered to Burdett within 3 months of the execution of this agreement, a second light-up sign will be delivered to Burdett within 6 months of the execution of this agreement, and one non-lit sign will be delivered to Burdett within 9 months of the execution of this agreement. In the event that Riahi fails to comply with this paragraph . . ., Riahi agrees to pay as liquidated damages to Burdett in the amount of $10,000.00, and Burdett shall additionally be entitled to an injunction to enforce Riahi's compliance with this paragraph."

Burdett agreed to pay Riahi $45,000 in exchange for Riahi's assignments. Burdett also agreed to grant Riahi a nine-month license to use the Sacred Leaf mark and would

not open a Sacred Leaf retail store in three specified cities within two years of executing the agreement.

Both parties agreed that they would not make any statements or engage in conduct which disparages the conduct, character, or reputation of any other party to the agreement. And the parties agreed to dismiss the pending lawsuit.

Finally, Burdett and Riahi agreed that if either party sought to enforce the settlement agreement through a lawsuit, the nonprevailing party would be liable for the prevailing party's reasonable attorney fees and costs.

On June 28, 2019, Burdett's attorney contacted Riahi's attorney and told him that he believed Riahi had breached the settlement agreement because he had not delivered the first light-up sign within three months of executing the settlement agreement. On July 3, 2019, Burdett's counsel sent Riahi's attorney a proposed settlement offer where Burdett agreed to not seek the $10,000 liquidated damages, injunction, or attorney fees and Riahi would deliver the signs as agreed to a specified address. In addition, Riahi's license to use Sacred Leaf would be terminated immediately. Riahi did not accept the offer and claimed that his attorney never communicated the offer to him even though his attorney contacted him around an hour after the settlement offer was extended.

On July 9, 2019, Burdett sent Riahi a text message telling Riahi that he was supposed to have delivered one of the signs already or pay a $10,000 penalty. Riahi responded, telling Burdett:

"Can you do the world a favor and kill yourself?

"And btw, you've made a total of zero attempts to pick this sign up and their [sic] is zero details in the contract of how the sign should be transferred. No matter what lies you

3

want to come up with. Let's go ahead and do this in court since ur [sic] such a lil [pejorative] all the time

"Seriously, you're [expletive] pathetic. No matter how much money you make in your life you are [expletive] pathetic[.]"

Burdett responded, telling Riahi that he was supposed to deliver the sign. Riahi asked Burdett to show him where it said that in the contract and Burdett replied with a picture of the relevant text which says that the sign will be "delivered to Burdett." Riahi replied: "Well god damnit, it does say delivered." Riahi said that he asked his attorney if that text was in there and was told no, otherwise, he said he would have been more diligent. Riahi then said, "So sue me and I guess we'll lose, god damnit."

Burdett replied with another settlement offer, asking Riahi to pay the $10,000, "drop the signs," and pay his accrued attorney fees. Riahi said, "Nope, let's just do this" and "[i]f the contracts voided I get to talk to your wholesalers anyways. That's worth the money[.]"

Ultimately, on July 23, 2019, Burdett filed a breach of contract action against Riahi. In his suit, he also requested injunctive relief, liquidated damages, and attorney fees. A bench trial was held on the matter in June 2020.

At trial, Burdett testified that he performed all the items he was supposed to as it related to the settlement agreement. According to Burdett, while he and Riahi were negotiating the settlement agreement, Riahi mentioned that he had the three signs, with a total value of around $10,000, and was requesting money for the buyout. Burdett testified that he was fine paying the extra money as part of the settlement to get the signs delivered to him.

4

Burdett testified that shortly after the agreement was signed, he opened a new store in Midland, Texas, and that the store could have used a sign if he had received one in time for the opening. In total, Burdett thought that he had eight to ten stores opening in the relevant time that could have used a sign. As for the Texas store, Burdett contracted with a sign company in Texas who created and installed a new sign in late July 2019. The total price of the project was $7,592.40. The price included the removal of an old sign, some work with window vinyl, and the manufacture and installation of the new sign. Burdett estimated that he paid at least one-half of the total amount, if not more, to have the new sign manufactured. In his experience, a new sign like the one he bought costs between $1,500 and $4,000.

On cross-examination, Burdett acknowledged that he entered into a deal to have the sign installed in May 2019—before Riahi was supposed to have delivered the first sign in June 2019. Burdett explained that he did not contract with the company to create the sign in May 2019. Burdett also acknowledged that the sign Riahi was delivering was a different type of sign and was generally less expensive than the one he had newly manufactured.

Burdett testified that he would not have agreed to the settlement payment without the $10,000 payment for noncompliance included within the settlement agreement.

According to Burdett, Riahi had the signs delivered shortly after Burdett sued. On or before July 23, 2019, Riahi tried to have two of the signs delivered to Burdett's store in Lawrence, Kansas, but the delivery was refused. Ultimately, someone called Burdett and he gave them the address to his warehouse in Topeka, Kansas, and the signs were delivered and accepted there. The Topeka address was originally provided to Riahi's attorney in the settlement offer email in early July 2019.

When questioned by Riahi's attorney, Burdett acknowledged that he probably used vulgar language when speaking with Riahi in the past. Burdett also acknowledged that he considered the $10,000 payment a penalty, or to provide some security for Riahi's performance of delivering the signs.

At trial, Riahi acknowledged that he violated the settlement agreement because he did not deliver the first sign within 90 days of executing the agreement. Riahi testified that he understood the agreement to mean that Burdett got the $10,000 if none of the signs were delivered. Riahi also agreed that, based on the plain language of the contract, Burdett was entitled to $10,000 and an injunction to enforce compliance if Riahi did not comply with the settlement agreement's provision on the signs.

When discussing the timeline for delivering the signs, Riahi agreed that the first sign would be late, according to the agreement, a "little bit after 90 days." But then when asked if the first sign would be considered delivered late on August 1, more than 90 days after the execution of the agreement, Riahi said, "[n]o."

When discussing the settlement agreement, Riahi explained that he assumed that the three signs were worth about $10,000 all together and that they were essentially included in the cost of the buyout—which was $45,000. By including the delivery of the signs, Riahi got closer to the amount he sought when Burdett bought his interest in the brand and could get rid of signs he would no longer need. As Riahi understood it, he would owe Burdett the $10,000 if he failed to deliver all the signs and the canopy. Riahi did not take the agreement to mean that he had to pay the $10,000 to Burdett if he was late in delivering a sign.

After considering the evidence, the district court ruled in Riahi's favor. First, the district court determined that the $10,000 "liquidated damages" provision was actually a penalty because: it was "security for the performance" of the delivery of the canopy and

6

signs, made no attempt to calculate actual damages, and did not differentiate between minor or major breaches. The court held that another factor showing that it was a penalty was that the clause purported to allow Burdett to receive the $10,000 and still required compliance on Riahi's part under the contract. The court also noted that Burdett viewed the clause as a penalty.

The court further noted that in the end, Burdett received the three signs and could use them as he pleased, negating his argument for damages.

The court also questioned whether a material breach of the contract had occurred. The court reasoned that the provision is enacted by "noncompliance with the paragraph, not the individual sentences." Then, the court noted that the contract did not mention time being of the essence.

The court entered judgment in favor of Riahi and ordered Burdett to pay Riahi's reasonable attorney fees.

Burdett timely appeals.

ANALYSIS

Burdett raises four main issues on appeal. First, he argues that the district court erred when it held that Riahi did not materially breach the settlement agreement. Second, he argues that the district court erred when it determined that he did not prove actual damages that resulted given Riahi's breach. Third, he argues that the district court erred when it held that the "liquidated damages" clause of the settlement agreement was an unenforceable penalty. Finally, he argues that the district court erred in granting Riahi attorney fees.

*Did the district court err by determining that Riahi did not materially breach the settlement agreement?*

*Standard of Review*

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or rulings. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

Whether a contract has been breached is a question of fact. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013). This court reviews questions of fact for substantial competent evidence. Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019).

When determining whether substantial competent evidence supports the district court's findings, appellate courts "must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017). An appellate court will not reweigh the evidence or assess the credibility of witnesses. 305 Kan. at 881.

*Discussion*

On appeal, Burdett argues that Riahi willfully failed to comply with the settlement agreement by failing to deliver the first sign within three months of entering into the settlement agreement. On the other hand, Riahi argues that the precise date of delivery of the first sign was immaterial and that he substantially complied with the contract.

Our Supreme Court set out the elements of breach of contract in *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013), where the court stated:

> "The elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."

Even if a defendant technically breaches a contract, the breaches can be excused if the defendant has substantially performed his or her part of the contract. *Dexter v. Brake*, 46 Kan. App. 2d 1020, 1033, 269 P.3d 846 (2012). When discussing the doctrine of substantial performance, this court has noted that it is "'intended to protect the right to compensation of those who have performed in all material and substantive particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects.'" 46 Kan. App. 2d at 1033 (quoting 15 Williston on Contracts § 44:52, p. 220-21 [4th ed. 2000]). But the doctrine does not apply when the parties, by the terms of their agreement, make it clear that only complete performance is satisfactory. 46 Kan. App. 2d at 1033-34. Nor does it apply if the breach was willful. *First Nat'l Bank of Omaha v. Centennial Park*, 48 Kan. App. 2d 714, 725, 303 P.3d 705 (2013).

In addition, "substantial performance is in direct contrast to the concept of material breach." *Dexter*, 46 Kan. App. 2d at 1034. Thus, "[i]f a breach is material, substantial performance has not been rendered." 46 Kan. App. 2d at 1034. A breach is material if one party receives something substantially less or different than he or she bargained for. 46 Kan. App. 2d at 1034.

When considering whether there has been substantial performance of a contract, the party's performance may be considered complete "if the essential purpose of the

9

contract is accomplished and that party has made a good-faith attempt to comply with the terms of the agreement even though he or she fails to meet the precise terms of the agreement." *First Nat'l Bank of Omaha*, 48 Kan. App. 2d at 725. Generally, whether a party has substantially performed is a question of fact. But appellate courts may determine whether a party has substantially performed if the relevant circumstances are undisputed. 48 Kan. App. 2d at 725.

One of the crucial questions at the center of Burdett's argument is whether it was essential that Riahi deliver the first sign within three months of execution of the settlement agreement. The district court ruled that Riahi did not have to do so, even though the agreement stated that "one light-up sign will be delivered to Burdett within 3 months of the execution of this agreement." In its ruling, the district court explained that "this lawsuit was initiated prior to the ultimate timeline set forth in the contract . . . there was still time for the ultimate paragraph compliance to have occurred." The court questioned whether "a material breach occurred" and stated that the "[liquidated damages] provision is enacted by noncompliance with the paragraph, not the individual sentences." The court noted that the contract made "no mention of time being of the essence" and accepted Riahi's argument that he substantially complied with the relevant paragraph.

Here, it seems that the essential purpose of the contract was not delivery of the signs within three, six, and nine months after the execution of the settlement agreement. Burdett acknowledged that the essential purpose of the settlement agreement was to "buy out [Riahi's] interest in the Sacred Leaf brand." Even after buying out Riahi's interest, Burdett gave Riahi a license which allowed him to continue to use the brand for an additional nine months. While the settlement agreement itself stated that the first sign needed to be delivered within three months of execution of the settlement agreement, this requirement does not seem to have been essential under the scope of the settlement agreement. Nor did the fact that Riahi did not deliver the first sign within this three-

10

month period mean that Burdett received substantially less than he had bargained for. Burdett still bought out Riahi's interest in Sacred Leaf, regardless of whether he received the first sign as quickly as he would have liked. See *Dexter*, 46 Kan. App. 3d at 1034.

This conclusion even becomes stronger when you consider that the settlement agreement did not include a "time [is] of the essence" clause—something the district court also pointed out in its decision. Generally, the time of performance is not material to a contract unless it is expressly stated or implied from the nature of the contract or circumstances under which it was negotiated. Whether time is of the essence in a contract is a question of fact. 17A Am. Jur. 2d, Contracts § 462 (2021). In contrast, when a contract includes specific dates for performance or includes a written provision stating that time is of the essence then performance should be completed by the set dates. *Campbell v. Fowler*, 214 Kan. 491, 496-97, 520 P.2d 1285 (1974).

In this case, there is substantial competent evidence to support the district court's conclusion that time was not of the essence for delivering the signs. The settlement agreement included no express clause stating that time was of the essence, nor did the agreement set out specific dates for the delivery of the signs. While the agreement did contain a timeline for the delivery of the signs, that timeline was not set out definitively when the parties negotiated the agreement because it was contingent on both parties signing the agreement which did not have to happen on any specific date. Because time was not of the essence as to the delivery of first sign, the second sign, or the third sign, Riahi did not materially breach the contract by failing to deliver the first sign within three months of the execution of the settlement agreement.

To that end, Riahi is correct that he substantially complied with the terms of the settlement agreement. Riahi tried to have two signs delivered on or before July 23, 2019, outside the three-month window for the first sign delivery but well within the nine-month

11

time requirement set out by the paragraph. Ultimately, all three signs were delivered on August 1, 2019—well within the nine-month time limit.

Burdett's argument that you cannot substantially comply if you willfully breach or do not make a good-faith attempt to comply with the terms of the agreement is immaterial because time was not of the essence. Riahi did not breach the contract with his failure to deliver the first sign within three-months of executing the settlement agreement. A breach would have occurred if Riahi had failed to deliver all three signs by the time the nine-month deadline occurred, but that is not the case here. Also, Burdett's citation to *Mabery v. Western Casualty & Surety Co.*, 173 Kan. 586, 592, 250 P.2d 824 (1952), for the proposition that he could sue for each unfilled obligation based on the intervals found in the settlement agreement is inapplicable here. In *Mabery*, the plaintiff was entitled to monthly payments until the plaintiff could return to work. As our Supreme Court noted, if the plaintiff could not return to work at all he would have a right to monthly payments for life. If the plaintiff was never able to return to work, then, without filing suit for past defaults, plaintiff could not recover from the defendant until after his death which put the plaintiff in a not ideal situation. 173 Kan. at 592.

The situation here is different. At most, Burdett would have to wait nine-months from the time the settlement agreement was executed on March 26, 2019. Waiting nine-months does not seem unreasonable in the context of this case. Simply put, as a matter of law, where the deliveries of the three signs were to cover a period of nine months, Riahi's delay in delivering the first sign did not constitute a breach of contract sufficiently material as to justify Burdett treating it as if the entire contract was at an end. This is especially so when all three signs were delivered and accepted by Burdett on August 1, 2019, well before the nine-month period had expired for delivery of the third sign. Thus, the district court did not err in determining that Riahi's failure to deliver the first sign within three-months of executing the settlement agreement was not a material breach of the contract.

*Did the district court err in determining that Burdett did not prove damages?*

For his second issue on appeal, Burdett argues that the district court erred by concluding that he did not prove actual damages because of Riahi's breach. In the alternative, Burdett argues that because Riahi breached the agreement the district court should have at least ordered that Riahi pay nominal damages.

*Standard of Review*

A determination whether the district court applied the correct measure of damages is a question of law, over which an appellate court has unlimited review. *Peterson v. Ferrell*, 302 Kan. 99, 106, 349 P.3d 1269 (2015).

With regards to the evidence of damages, appellate courts do not reweigh evidence or pass upon the credibility of witnesses. When deciding whether the evidence is insufficient to support a claim of damages because it is too conjectural or speculative, appellate courts examine the evidence in a light most favorable to the prevailing party. 302 Kan. at 106-07.

*Discussion*

In general, when considering damages, the goal of a court is to put the nonbreaching party in the position he or she would have been had the breach never occurred. 302 Kan. at 106. As Burdett notes in his brief, "'[w]here the cause and existence of damages are established with requisite certainty, recovery will not be denied because the damages are difficult to ascertain. In such cases, evidence which establishes the extent of damages as a matter of just and reasonable inference is sufficient.'" *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, 749, 894 P.2d 881

13

(1995) (quoting *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 582, Syl ¶ 2, 844 P.2d 768 [1993]).

Here, Burdett argues that he established with requisite certainty that he suffered damages because of the delay in receiving the first sign required him to contract to have a different sign created for his Texas store. But the district court clearly considered Burdett's argument and found that the facts were not in his favor.

First, the district court found that the sign ultimately installed in the Texas store is different from the sign that Riahi did not deliver to Burdett on time. The evidence supports the district court's finding. A different sign would, at the least have a different value, and could be an indication that Burdett would not have used the first sign even if it had been delivered on time.

Second, the district court found that the order and deposit for the new sign was begun before Riahi was supposed to have delivered the first sign. According to the testimony, Riahi was supposed to have delivered the first sign by June 26, 2019. But Burdett began to buy a replacement sign in May 2019 because "sign companies work two to three months out." As Riahi points out in his brief, it seems Burdett planned to purchase and install the new sign in Texas even if Riahi had delivered the first sign on time.

Finally, the district court found that, when the trial was held, Burdett had all three signs and could use them in whatever manner he wanted. And, as Burdett testified, all three signs were sitting in his warehouse when the trial occurred.

Based on those findings, the district court was correct to rule that Burdett failed to prove actual damages. In the end, Burdett received all three signs before he was supposed

14

to, and his one claim of actual damages involved contracting for a new sign before he was even supposed to have received the delivery of the first sign.

*Did the district court err in concluding that the "liquidated damages" provision was an unenforceable penalty?*

For his third issue on appeal, Burdett argues that, assuming Riahi breached the contract, the district court erred in determining that the "liquidated damages" provision of the settlement agreement was an unenforceable penalty.

*Standard of Review*

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or rulings. *Born*, 304 Kan. at 554.

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. [Citation omitted.]'" *Peterson*, 302 Kan. at 104.

*Discussion*

"[A] liquidated damages clause in a contract is an advance settlement of the anticipated actual damages arising from a future breach." *Carrothers Constr. Co., v. City of South Hutchinson*, 288 Kan. 743, 754, 207 P.3d 231 (2009). Liquidated damage provisions enable contracting parties to "protect themselves against the difficulty, uncertainty, and expenses that necessarily follow judicial proceedings when trying to ascertain actual damages." 288 Kan. at 754. Thus, "parties may stipulate at the time of

15

contracting to a set damages amount for a breach of that contract, as long as the liquidated damages provision is not a penalty." 288 Kan. 754.

The distinction between a penalty and liquidated damages is that "a penalty, in effect, is a security for performance, while a provision for liquidated damages requires a sum certain to be paid in lieu of performance." 288 Kan. at 754-55. When determining whether a contractual provision is for liquidated damages or is an unenforceable penalty, courts do not treat the words used in the contract as determinative. Instead, the terms used are mere evidence. Along with the terms used, courts consider whether the amount stipulated is conscionable or reasonable in view of the value of the subject matter of the contract and whether the actual damages resulting from a breach would be difficult to determine. 288 Kan. at 755. The party challenging the provision bears the burden of showing that a liquidated damages clause is an unenforceable penalty. 288 Kan. at 755.

Again, even if the parties may have called the payment liquidated damages in their settlement agreement, this does not restrict this court from analyzing the provision or stipulation independently and deciding for itself whether the provision is one for reasonable liquidated damages.

Here, the actual damages of a breach do not seem particularly difficult to ascertain. The cost of a replacement sign could be figured out by common experience between the parties, even when attempting to do so in a prospective manner. For example, Burdett testified that the total cost for him to set up his new Midland, Texas, store was $7,592.40. He estimated that at least one-half of the cost was used to manufacture and install a new sign for the store. Based on Burdett's estimate, the new sign would have cost approximately $3,800 to make and install. Thus, this seems how the parties arrived at the $10,000 figure for liquidated damages: by estimating the cost of producing each sign, which would be between $3,300 and $3,800.

16

Under the liquidated damages provision in question, if Riahi was delayed in delivering one sign, Burdett would be entitled to the full $10,000 amount as liquidated damages. So this liquidated damage clause of $10,000 is a penalty because of the following reasons: (1) the amount of $10,000 set in advance is plainly disproportionate to Burdett's possible actual damages because if Riahi had failed to timely deliver a single sign to Burdett, Riahi would have forfeited $10,000 under the settlement agreement; (2) this forfeiture amount was grossly in excess of the $3,300 to $3,800 to manufacture or produce a single sign; and (3) the actual damages flowing from a delay in delivering a sign were readily ascertainable since both parties reasonably knew the cost to manufacture or produce a single sign was between $3,300 and $3,800; hence, the type of damages were not difficult or impossible to calculate with accuracy, and the use of a liquidated damages clause was unnecessary.

Finally, the provision itself acts as a security for performance rather than an actual attempt to mitigate damages. Under the settlement agreement, Riahi would have to pay the $10,000 for a single sign delivered late and still be required to deliver the sign. At that point, the $10,000 is not a sum "to be paid in lieu of performance" which suggests the provision is for liquidated damages. See *Carrothers*, 288 Kan. at 754-55. Instead, the $10,000 is a penalty on top of the additional requirement of performance because, under the settlement agreement terms, "Burdett shall additionally be entitled to an injunction to enforce Riahi's compliance."

For this reason, the district court did not err in ruling that the liquidated damages provision of the settlement agreement was an unenforceable penalty.

*Did the district court err by concluding that Riahi was entitled to attorney fees?*

For his final issue on appeal, Burdett argues that the district court incorrectly granted Riahi attorney fees because he should have prevailed on his earlier issues and because Riahi essentially goaded Burdett into filing the suit.

*Standard of Review*

Appellate courts exercise unlimited review when determining whether the district court had authority to award attorney fees. *Unruh v. Purina Mills*, 289 Kan. 1185, 1200, 221 P.3d 1130 (2009). If the trial court has the authority to grant attorney fees, the decision to grant the fees is reviewed under an abuse of discretion standard. 289 Kan. at 1200.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

*Discussion*

"A court may not award attorney fees absent statutory authority or an agreement by the parties." *Unruh*, 289 Kan. at 1200.

In this case the parties agreed that "[i]f either party seeks to enforce this Settlement Agreement through the filing of a lawsuit, the non-prevailing party shall be liable for the prevailing party's reasonable attorney fees and any other costs of enforcement."

The parties signed an agreement which provided the district court with the ability to order attorney fees. On appeal, Burdett argues that the district court erred when it ruled

18

that Riahi did not breach the contract. Thus, the district court should have determined that Burdett was the prevailing party and ordered Riahi to pay his attorney fees. Given our analysis in the first issue, Burdett's argument is unpersuasive.

Burdett argues that the district court should have refused to honor the attorney fees agreement given Riahi's conduct before delivering the signs. In support, Burdett cites *Curo Enterprises v. Dunes Residential Services, Inc.*, 51 Kan. App. 2d 77, 87-88, 342 P.3d 948 (2015), where this court stated, "[b]roadly speaking, we agree with the Utah Court of Appeals that 'when interpreting contractual "prevailing party" language, a court should employ a flexible and reasoned approach' that allows room for common sense to guide a court's decision." (Quoting *Westmont Mirador LLC v. Shurtliff*, 333 P.3d 369, 373 [Utah App. 2014]).

But that cite does little to support Burdett's point. In *Curo Enterprises*, the court was discussing how you can determine who the prevailing party is when it is not clear. But no such question exists here, either Riahi materially breached the contract by failing to deliver the first sign within three months of the execution of the settlement agreement, or he did not.

As to the actual awarding of attorney fees, the district court had the discretion to do so. The trial court heard the testimony and examined the evidence. Burdett fails to show that the district court reached its decision based on an error of law or an error of fact, or that the court issued an arbitrary, fanciful, or unreasonable decision. Riahi may have used offensive language when talking to Burdett, but that does not change the fact that he did not materially breach the contract which awarded the prevailing party with attorney fees and that Riahi prevailed in the suit.

Affirmed.

19